Khalid CHOUDHRY, Plaintiff-Appellant,

v.

Leo D. JENKINS et al., Defendants-Appellees.

No. 76-1967.

United States Court of Appeals, Seventh Circuit.

Heard April 11, 1977.

Decided July 22, 1977.

2. The matter is before us on a short record.

Myrna Hart, Valparaiso University School of Law, Valparaiso, Ind., for plaintiff-appellant.

Theodore Sendak, Attorney General, Darrel K. Diamond, Asst. Atty. Gen., Indianapolis, Ind., for defendants-appellees.

Before CASTLE, Senior Circuit Judge, and CUMMINGS and PELL, Circuit Judges.

CUMMINGS, Circuit Judge.

■ On June 24, 1976, Khalid Choudhry, a Pakistani resident alien, was terminated from his position as a correctional officer at the Indiana State Prison at Michigan City, Indiana, after making certain critical comments about the prison's administration to the press. About a week after his dismissal, Choudhry filed a verified 42 U.S.C. § 1983 complaint alleging that his dismissal by the defendant prison officials had unconstitutionally infringed upon his free speech rights secured to him under the First and

Fourteenth Amendments.[1] Plaintiff sought damages as well as declaratory and injunctive relief. Along with his complaint, plaintiff filed a motion for a temporary restraining order commanding his reinstatement as a correctional officer at the prison. On July 19, 1976, after hearing evidence and argument on the question of whether the temporary restraining order should issue, the district court took the matter under advisement.[2] Two weeks later, the district judge entered an order with an accompanying Memorandum which denied plaintiff's motion for injunctive relief and which *sua sponte* decided that summary judgment be entered in favor of the defendants. This appeal resulted.

I

Once again we are confronted with "one of those troublesome cases in which an appeal follows a disposition occurring by way of procedures amounting to something less than a full trial and which, upon consideration of the briefs, oral argument, and record, presents serious procedural questions in a record situation wherein further attention at the trial court level with rectification of any procedural errors conceivably could be followed by the same result as before in the litigation. Nevertheless, bearing in mind the words of Mr. Justice Frankfurter that fairness of procedure is due process in the primary sense, *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 161, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (concurring opinion), we address ourselves to the issues raised upon this appeal to determine whether a reversal is required." *Macklin v. Butler*, 553 F.2d 525, 527–528 (7th Cir. 1977).

On June 18, 1976, two months after being hired as a probationary correctional officer at the prison,[3] Choudhry called the press to his home to express concern about security conditions at the prison. He also criticized the fact that he had received no formal training during his employment. Warden Jenkins thereupon issued a lock-out order against Choudhry barring him from the prison and suspended him pending an investigation. Articles based upon the press interview appeared in area newspapers the next day. The June 23 letter from Warden Jenkins informing Choudhry of his suspension recited that this "action and investigation has been necessary due to certain public allegations you have made regarding the security and organization of this institution."

On June 22, an administrative hearing was held by the prison authorities which plaintiff was required to attend without counsel although he was permitted, and in fact chose, to attend with a union representative present. After the prison authorities questioned plaintiff on the basis for the charges he made in the press interview, they made recommendations to Warden Jenkins who decided to terminate plaintiff. In his dismissal letter of June 25, Warden Jenkins stated dismissal

"Has been deemed necessary due to the fact that you admitted giving parts of the contents of the [Guard] Post Orders to non-Department of Correction staff.

---

1. A lawfully admitted resident alien, of course, is a person within the meaning of the Fourteenth Amendment. *Graham v. Richardson*, 403 U.S. 365, 371, 91 S.Ct. 1848, 29 L.Ed.2d 534. Therefore, he enjoys the protection of those amendments in the Bill of Rights which are incorporated through the Fourteenth Amendment so as to be applicable to the states, at least in matters wholly unrelated to immigration and naturalization.

2. The complaint and motion for restraining order were filed in the Hammond Division of the United States District Court for the Northern District of Indiana. On July 7, 1976, a hearing

on the temporary restraining order was held before a Hammond Division judge who found venue improper. The case was transferred to the South Bend Division where the restraining order hearing was held on July 19.

3. Since First Amendment rights can be properly conceptualized as being secured by the liberty as opposed to the property clause of the Fourteenth Amendment, plaintiff's status as a probationary public employee is immaterial if his speech would be otherwise protected under the First Amendment. *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570.

This act constitutes a breach of security. Therefore you are unable to satisfactorily perform the duties and requirements of a Correctional employee at the Indiana State Prison."

At the temporary restraining order hearing, defendants conceded that Choudhry's dismissal was prompted by his public statements.

Relying on *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811, Judge Grant noted that "open comment by a public employee which is false, and made with the knowledge of its falsity or with reckless disregard of the truth, constitutes an impermissible form of expression" (Mem. op. at 4). Moreover, the district court found *Pickering* to stand for the proposition that "certain statements, although true, may fall outside the ambit of first amendment protection if the need for confidentiality is so great as to justify a dismissal of the employee." *Id.* Applying these legal standards, Judge Grant found the plaintiff's allegations to be "wholly insubstantial" based on the "briefs, exhibits, and testimony of several witnesses." *Id.* The district court also found "these false utterances which appear in the newspaper articles have been made with reckless disregard as to their truth or falsity." *Id.* at 5. Given these findings the court reasoned that although

> "the principles of the Constitution are great, it is [the] real and serious threat to societal order which tips the balance in favor of defendants. This potential for disruption in a prison context is the factor which effectively distinguishes plaintiff's authority." *Id.* at 7.

The court concluded "[j]ust as 'the first amendment would not protect a man in falsely shouting fire in a theatre,' *Schenck v. United States*, 249 U.S. 47, 52 [39 S.Ct. 247, 63 L.Ed. 470] (1919), it cannot protect him in creating disturbances within a prison via the news media." *Id.* at 8.

As to certain true information allegedly given to the press concerning escape prevention procedures, Judge Grant held that "while the dissemination of the truth should rarely be prohibited, this Court finds that the potential adverse consequences flowing from the disclosure of the prison's weaponry and defense tactics clearly outweigh Choudhry's interest in speaking on matters of public concern." *Id.* at 8. Having decided that Choudhry's First Amendment rights had not been infringed, the court *sua sponte* granted summary judgment in favor of the defendants, *viz*:

> "[S]ince Choudhry has based his entire cause of action upon an unmeritorious constitutional claim, the defendants are entitled to an award of summary judgment. Accordingly, the Court, on its own motion, will grant summary judgment in favor of the defendants since there exists no genuine issue of fact which may alter the findings or conclusions of this Court." *Id.* at 9.

## II

The district court's award of summary judgment came with no warning, taking plaintiff completely by surprise. No written or oral motion for summary judgment had been made nor does the record disclose a Rule 12(b) motion to dismiss. But most importantly, the district court itself definitively declared that it was limiting its attention to the temporary restraining order:

> "I'm not going to decide this case upon its final merits at this time and we are here only on the question of a temporary restraining order." Tr. at 159–169.

Shortly after this recitation, the district court offered the following response to plaintiff's suggestion that *Pickering* required balancing the rights of the speaker against the rights of the employer:

> "I think they would weigh heavier on your side if we were looking at this as on final merits. We are talking about a temporary restraining order right now without further evidence, without further thought." Tr. at 161–162.

■ Rule 56 plainly does not authorize a court to enter an arbitrary summary judgment *sua sponte* against a party; indeed the express language of paragraphs (a) and (b) of the Rule discloses that a motion for

summary judgment is to be made by a party. Professor Moore consequently has concluded that "the court should rarely consider entering summary judgment *sua sponte* where no party has moved for summary judgment or the provisions of Rule 12 are not satisfied." 6 Moore's Fed.Prac. ¶ 56.12 (2d ed. 1976) at 338–339. We agree. Without a party-generated Rule 56 motion or Rule 12(b) motion which may be treated under Rule 12 as a motion for summary judgment, the district court normally lacks power to enter summary judgment. See *Dry Creek Lodge, Inc. v. United States*, 515 F.2d 926, 935–936 (10th Cir. 1975); *Mustang Fuel Corp. v. Youngstown Sheet and Tube Co.*, 480 F.2d 607, 608 (10th Cir. 1973). Here no party-generated Rule 56 or Rule 12(b) motion was made.

Sound policy supports our reading of Rule 56. "The early resolution of factually unsupported claims is a salutary purpose of summary judgment procedure, but that procedure in no way authorizes disposition by surprise." *Macklin v. Butler*, 553 F.2d 525, 530 (7th Cir. 1977). On those few occasions when district courts have attempted the *sua sponte* entry of summary judgment, the courts of appeals have reversed, recognizing that the notice and hearing policies of Rule 56 otherwise would be slighted. *Twin City Federal Savings and Loan Ass'n v. Transamerica Ins. Co.*, 491 F.2d 1122 (8th Cir. 1974); *Bowdidge v. Lehman*, 252 F.2d 366 (6th Cir. 1958); cf. *Brown v. Quinlan*, 138 F.2d 228 (7th Cir. 1943); see also *Morgan Guaranty Trust Co. of New York v. Martin*, 466 F.2d 593 (7th Cir. 1972).

██ Rule 56 "contemplates both fair notice that a summary judgment motion has been made and a reasonable opportunity to respond * * *." Material offered in "support of [plaintiff's] motion for a [restraining order] * * * the content of [which] was narrowly limited to the issues raised in that motion" simply does not permit the conclusion that Choudhry "receive[d] a fair opportunity to establish the existence of material controverted facts." *Macklin v. Butler*, 553 F.2d 525, 528 and n. 2 (7th Cir. 1977).

"Under proper circumstances [the notice and hearing] requirements of the Rule may be waived." *Mustang Fuel Corp. v. Youngstown Sheet and Tube Co.*, 480 F.2d 607, 608 (10th Cir. 1973). For example, in *United States v. Fisher-Otis Co.*, 496 F.2d 1146 (10th Cir. 1974), the parties agreed at a pre-trial conference to submit certain issues of law for decision by the court prior to the trial of factual issues. "By joining in the submission of the ultimate legal issues [t]herein involved to the District Court for resolution, defendants assumed or conceded that, as to the resolution of those legal issues, there were no essential facts in dispute." *Id.* at 1151–1152. In this posture, the "filing of a motion for summary judgment would have been a mere formality." *Id.* at 1152. See also *Wirtz v. Young Electric Sign Co.*, 315 F.2d 326 (10th Cir. 1963). No such waiver exists here.

██ It is, of course, well settled that a district court is not authorized to resolve issues of fact on a motion for summary judgment. However, the dissent argues that the undisputed significant facts—"that a novice guard called what amounted to a press conference and told reporters that he did not know how to use a gun and that security was lax and disorganized"—fully justify the guard's dismissal "in the tinderbox context of any prison dependent upon security exceeding the purely minimal." We have no quarrel with the dissent's view that *Pickering's* constitutional balance must be struck in the context of the special factual tableau of the prison. And we are in general agreement that in the individual versus public interest assessment, the public interest is entitled to "very heavy weight in the measuring scales."

██ But besides the prevention of incendiary remarks in the prison setting, the public interest also encompasses concern for remarks which disclose prison security so abysmal as to put the public in jeopardy.[4]

---

4. In this regard, we note that in the fall of 1975, six prisoners escaped from the facility and kidnapped Warden Jenkins and members of his family on a night when 27 guards were on duty

The public is entitled to know the state of the prison security as it impacts on public safety. A new recruit not yet steeped in the administrative system who informs the public of lax prison security therefore can find his and the public's interest to be partially coincident. We conclude the undisputed facts identified by the dissent are not *per se* sufficient to dismiss out of hand a suit implicating freedoms as fundamental and sensitive as those secured by the First Amendment.

Thus to the extent that the district court's decision here is based on a rejection of plaintiff's version of the operative material facts, it could not stand wholly apart from notice defects. *Illinois State Employees Union, Council 34 v. Lewis*, 473 F.2d 561, 565–566 (7th Cir. 1972). The hearing below disclosed numerous unresolved material factual issues. As to plaintiff's supposed failure to follow the established chain of command, Choudhry testified he had contacted several of his superiors a number of times with questions and complaints even though he had not been instructed to do so. Assistant Warden Duckworth testified Choudhry was given on-the-job training in using a gun. Choudhry flatly rejected this testimony, and fellow prison guard Anthony Owens testified that he had never been taught to shoot a gun either.

Other disputes concerned whether Choudhry did or did not make certain statements to the press. Thus Choudhry denies telling the news media that a gun had been smuggled into the maximum security area or about an alleged escape route. In addition, certain guard post orders released to the press were alleged to be "classified" so that providing this information to the media itself was sufficient ground for dismissal. But Choudhry and other guards testified that they were unaware that such information was confidential. In any event, there was a factual conflict on whether the prison inmates already knew the substance of the supposedly "confidential" information.

From a close reading of the temporary restraining order hearing transcript in conjunction with a similar study of the administrative hearing transcript, one might infer that Judge Grant's apparent view that Choudhry's testimony was not a paradigm of cogency or persuasiveness had some validity. But Choudhry's testimony was not a transparent sham. Since we are not "convinced that the issues of fact created by [Choudhry] are not issues which this Court could reasonably characterize as genuine," summary judgment was improper. *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 544 (9th Cir. 1975). We hasten to add, however, that public employers need not fear the expense of a full-blown trial if they discharge an employee for his "irresponsible mouthing." In the forthcoming proceedings in the district court after remand, if the defendants file a motion for summary judgment, the district court is entirely free to grant summary judgment if the developed record shows no issue of genuine material fact.

### III

■ Defendants posit an alternate ground for the district court's action. They suggest a Rule 41(b) dismissal after consolidation with trial on the merits pursuant to Rule 65(a)(2) can support the district court's disposition. This alternate ground may not prevail. First the district court explicitly relied only on Rule 56 in granting a summary judgment. In addition, it is not immediately clear why a Rule 41(b) dismissal is appropriate where there is no failure to prosecute the suit or to comply with court rules or orders. In any event, there was no notice of consolidation; indeed there was no inkling of it anywhere in the record until defendants raised it in their brief. Notice of consolidation and an opportunity to object are required for fundamental fairness. *Pughsley v. 3750 Lake Shore Drive Cooperative Bldg.*, 463 F.2d 1055, 1056 (7th Cir. 1972); *Nationwide Amusements Inc. v. Nattin*, 452 F.2d 651, 652 (5th Cir. 1971).

(Pl. Ex. 10). Jenkins was not present at the temporary restraining order hearing below be-

cause he had a prior subpoena to appear at the trial of one of those prisoners (Tr. at 126).

## IV

■ Yet while in the absence of a party-generated Rule 56 or Rule 12(b) motion the district court usually lacks power to enter a summary judgment, we must not cavalierly overlook the one specie of Rule 12 motion that can be made by the court on its own motion. Rule 12(h)(3) permits a court to dismiss an action *sua sponte* when the court determines it lacks subject matter jurisdiction. "[W]here the complaint, as here, is so drawn as to seek recovery directly under the Constitution or laws of the United States, the federal court [unless the federal claim is immaterial or wholly insubstantial] must entertain the suit." *Bell v. Hood,* 327 U.S. 678, 681–682, 66 S.Ct. 773, 776, 90 L.Ed. 939. But the alleged First Amendment violations here "are not immaterial but form rather the sole basis of the relief sought." *Id.* at 683, 66 S.Ct. at 776. Instead the district court might have proceeded under the assumption that Choudhry's First Amendment "cause of action is so patently without merit as to justify, * * the court's dismissal for want of jurisdiction." *Id.*[5] Indeed defendants agree with this view in their brief:

> "The opinion of the District Court does not explicitly state that Choudhry's case is frivolous, but it is submitted that the opinion is tantamount to such a finding and that such a finding would be appropriate." (Br. at 9 n.*.)

In order to be deemed "wholly insubstantial and frivolous" in the constitutional sense, a claim must be measured against a severe standard. 327 U.S. at 682–683, 66 S.Ct. 773. "[C]laims are constitutionally insubstantial only if the prior decisions inescapably render the claims frivolous; previous decisions that merely render claims of doubtful or questionable merit do not render them insubstantial * * *." *Goosby v. Osser,* 409 U.S. 512, 518, 93 S.Ct. 854, 859,

35 L.Ed.2d 36. One can conceive of situations where prison guards should be able to vent administrative incompetence to the public when prison security will not be unduly jeopardized thereby. Since the undisputed factual predicate here does not inexorably lead to the conclusion that Choudhry's statements were not constitutionally protected, we need not "decide nor intimate any view upon the [ultimate] merits," *id.* at 522, 93 S.Ct., at 861 in order to conclude that the prior decisions cited to us by the defendants or those used by the district court leave " 'room for the inference that the question sought to be raised [by Choudhry] can be the subject of controversy.' " *Id.* at 519, 93 S.Ct. at 859. As a result, a Rule 12(h)(3) dismissal cannot be sustained either.

## V

Accordingly, the district court's order entering summary judgment for the defendants is reversed and the cause is remanded for further proceedings consistent herewith.

PELL, Circuit Judge, dissenting.

I am in general agreement with the majority that procedural due process, particularly as spelled out in the Federal Rules of Civil Procedure, would require something more than was here involved before summary judgment would be proper. This would seem to be particularly true where the claim for relief was based upon one of our most fundamental constitutionally guaranteed liberties, that of freedom of speech. Nevertheless, upon the record before us I think the district court properly entered summary judgment terminating litigation which I do not conceive could reach a different result no matter how much notice was given, no matter how much evidence was adduced, and no matter how

---

**5.** The district court's language indicates that it implicitly viewed Choudhry's claim as "patently without merit" under *Bell.* Thus at the conclusion of the temporary restraining order hearing, the court noted:

> "I would say frankly I am going to find it difficult to grant this restraining order, but if

I find so under the authorities that I have no alternative, I would do so." Tr. at 172. Moreover, the court found the "allegations of the plaintiff to be wholly unsubstantial" (Mem. op. at 4). "Choudhry cannot now rely upon the protections of the first amendment to justify his reckless form of expression." *Id.* at 9.

much irrelevant and immaterial factual conflicts might be developed.

Here the material and dispositive facts existed not only without substantial controversy but, indeed, without any controversy. Those material facts as to which there was no genuine issue are stated in the majority opinion:

On June 18, 1976, two months after being hired as a probationary correctional officer at the prison, Choudhry called the press to his home to express concern about security conditions at the prison. He also criticized the fact that he had received no formal training during his . . . employment. [Footnote omitted.]

Not surprisingly another fundamental First Amendment freedom, that of the press, was promptly exercised and under the headline, "Guard blows whistle on prison," the lead paragraph read as follows:

A guard who mans one of the towers at the Indiana State Prison admits that he doesn't know how to fire a gun and a lot of the other prison guards don't either.

The next paragraph then quoted the plaintiff:

Khalid Choudhry said that is just one indication of how lax and disorganized security is at the state prison in Michigan City.

In his brief in this court, the plaintiff refers to contested issues of fact such as the dispute as to whether he had received any on-the-job training with a gun, what information about specific procedures in the prison was classified, and whether some of the so-called confidential information was not in fact known to the inmates. The significant facts which are not disputed are that a novice guard called what amounted to a press conference and told reporters that he did not know how to use a gun and that security was lax and disorganized. In his brief, furthermore, Choudhry contends that these are true. If the truth or falsity of some of these statements created genuine issues of material fact then, of course, summary judgment was improper. I cannot conceive, however, in the tinderbox context of any prison dependent upon security exceeding the purely minimal that the bare facts recited above, as to which there is no controversy, would not require the discharge of the employee irrespective of whether the reporters did or did not embellish some of the supporting specific factual details.

Even in the case of the public school teachers, while they may not be compelled to relinquish First Amendment rights, the "problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education of Township High School District 205, Will County*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968).

In arriving at a balance between the right of a prison guard to speak freely about the prison at which he is employed and the efficiency of the public service, the purlieus would seem far removed from the public schools, as tempestuous as some of the occurrences may now be in the cloistered halls.

The prison scene is the appropriate context for the balancing here just as it was in the matter of prison correspondence:

The case at hand arises in the context of prisons. One of the primary functions of government is the preservation of societal order through enforcement of the criminal law, and the maintenance of penal institutions is an essential part of that task. The identifiable governmental interests at stake in this task are the preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners. [Footnote omitted.]

*Procunier, Corrections Director v. Martinez*, 416 U.S. 396, 412, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974).

The Supreme Court likewise differentiated the prison scene and disciplinary pro-

ceedings therein from the considerations applicable to parole revocation in *Wolff, Warden v. McDonnell*, 418 U.S. 539, 561–62, 94 S.Ct. 2963, 2977, 41 L.Ed.2d 935 (1974):

Prison disciplinary proceedings, on the other hand [as contrasted with parole revocation proceedings] take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so. Some are first offenders, but many are recidivists who have repeatedly employed illegal and often very violent means to attain their ends. They may have little regard for the safety of others or their property or for the rules designed to provide an orderly and reasonably safe prison life. Although there are very many varieties of prisons with different degrees of security, we must realize that in many of them the inmates are closely supervised and their activities controlled around the clock. Guards and inmates co-exist in direct and intimate contact. Tension between them is unremitting. Frustration, resentment, and despair are commonplace. Relationships among the inmates are varied and complex and perhaps subject to the unwritten code that exhorts inmates not to inform on a fellow prisoner.

In the Court's words in *Wolff* it is against this background that we must make our constitutional judgments. In so balancing the respective interests of the individual to exercise his freedom of speech without regard to possible deleterious consequences to the governmental interests and still retain his employment, I think the public interest is entitled to very heavy weight in the measuring scales. While no doubt there has been considerable retreat from Judge (later Justice) Holmes' simplistic approach in *McAuliffe v. Mayor of City of New Bedford*, 155 Mass. 216, 220, 29 N.E. 517 (1892) that "[t]he petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman," see *Thompson v. Gallagher*, 489 F.2d 443, 446 (5th Cir. 1973), I do not conceive that the public weal is not entitled to a standard

which while according the public employee the right to speak as he wishes also requires him to be responsible for his statements. "When his speech is disruptive of the proper functioning of the public's business the privilege of governmental employment may be withdrawn without it being said that he was denied his freedom of speech." *Jenson v. Olson*, 353 F.2d 825, 828 (8th Cir. 1965).

These cases of necessity require case-by-case analysis. I do not suggest that in every case a prison guard should be precluded from commenting upon conditions in the prison; in considering the public interest we must be mindful that the public has an interest in knowing about the operation of its government. I am simply saying that this plaintiff with virtually no experience in the position showed such a blatant disregard for his responsibilities that the patent potentially incendiary nature of his remarks properly deprived him of the speech freedom mantle. That disastrous results did not follow the widespread dissemination of Choudhry's statements concerning prison security laxity, made deliberately for the purpose of that dissemination, is not attributable to any quality of restraint on the part of Choudhry but simply because of good fortune.

I also hold no brief for prison conditions as they exist generally throughout the country; but I would be ignoring reality if I did not also recognize that prison administrators are facing almost insuperable problems, which certainly were not bettered by the irresponsible mouthing of this plaintiff, not at a corner bar gabfest but at a press conference called by him. In sum, I would affirm the district court judgment as being one that should have been entered under the particular undisputed dispositive facts here involved.

I also add that it appears to me, in fairness to the district court judge, it should be observed that while he did comment during the course of the extended hearing on July 19, 1976, that what was before the court was the matter of the temporary restraining order, he also stated near the conclusion

of the hearing that there were exhibits in evidence which he had not had an opportunity to read. He indicated also that he wanted to give "this a little more thought and a little research." It would seem that after doing so for a reasonable length of time he concluded that the plaintiff's claim was meritless and with this I agree. I therefore respectfully dissent.