BANCO DE VIZCAYA, S.A., a Spanish Banking Corporation, Plaintiff,

v.

The FIRST NATIONAL BANK OF CHICAGO, a National Banking Association, Defendant.

No. 80 C 2731.

United States District Court, N. D. Illinois, E. D.

May 26, 1981.

Opinion Vacated July 23, 1981.

---

Michael W. Coffield, Charles W. Deuser, II, Mary L. Sebek, Coffield, Ungaretti, Harris & Slavin, Chicago, Ill., for plaintiff.

William B. Davenport, Sherman I. Goldberg, Laurence C. Franklin, First National Bank of Chicago, Law Div., Chicago, Ill., for defendant.

## MEMORANDUM OPINION

GRADY, District Judge.

Plaintiff Banco de Vizcaya brings this suit to recover on an irrevocable letter of credit issued by the Abu Dhabi branch of the First National Bank of Chicago ("FNBC–AD"). Before the court is the motion of defendant First National Bank of Chicago ("FNBC") to dismiss the complaint or, in the alternative, for summary judgment. Because we look beyond the pleadings, we treat the motion as one for summary judgment. For reasons discussed below, we grant summary judgment in plaintiff's favor.[1]

---

1. It is irrelevant that plaintiff has not formally moved for summary judgment.

If either the proponent of the claim or the defending party moves for a summary judg-

*I. Facts*

The material facts, while somewhat complex, are undisputed. In May of 1978, Consolidated Investment & Contracting Company ("Consolidated"), a partnership doing business in Abu Dhabi, issued a purchase order to Mundus Estructuras Metalicas, S.A. ("Mundus"), a Spanish corporation, for scaffolding to be shipped from Spain to Abu Dhabi. In order to guarantee payment to Mundus, Consolidated obtained an irrevocable letter of credit in the amount of $716,619.00 from FNBC–AD. The letter of credit provided that payment would be effected in dollars in Chicago at FNBC ("FNBC–C") 350 days after Consolidated received the pertinent documentation and presented it to FNBC–AD. In the margin, the letter of credit bore the following legend: "This credit is subject to the Uniform Custom and Practice for Documentary Credits (1974 Revision), International Chamber of Commerce Publication No. 290."

In reliance on the letter of credit, plaintiff advanced Mundus $592,957.43 in six separate payments between October 25, 1978, and November 15, 1978. By February 7, 1979, FNBC–AD had accepted and confirmed all the drafts plaintiff had submitted to it. However, before the first maturity date arrived, Consolidated, apparently unhappy with the quality of goods delivered, obtained an injunction in the Abu Dhabi Civil Court, blocking payment on the drafts and requiring the money it had deposited with FNBC–AD to be placed in a "suspense account." Defendant's Motion for Summary Judgment, Ex. A. FNBC–AD immediately notified plaintiff of the entry of the order and, on October 17, 1979, instituted an appeal. The appellate court affirmed the lower court's order, apparently on the mistaken theory that the money Consolidated had deposited with FNBC–AD was for the benefit of Mundus and was therefore an available source of funds from which to satisfy a judgment against the Spanish company. We have before us a translation of the court's opinion, which is somewhat difficult to follow. In justifying its attachment of the funds, the court stated

> Nobody says that the non-seizure on the sum of the letter credit, vide a judicial order, is one of the conditions of the letter of credit or is incorporated in the unified rules and conventions, to enable us to say that such seizure would expose the executor to any contractual responsibility or otherwise, and the reason is that no contract or agreement shall be made on a matter which may undermine the powers of the concerned state courts as being a matter relating to the supremacy of the state.

While something may have been lost in the translation, we discern two theories behind the court's judgment. First, it believed that funds deposited to secure a letter of credit are not, under international law, immune from attachment. Further, the court reasoned that even if the inherent qualities of an irrevocable letter of credit prohibit attachment, such prohibition would be void as an impermissible restriction on the power of the Abu Dhabi state court.

In the wake of this ruling, FNBC–AD countermanded authorizations for plaintiff's reimbursement which it had previous-

---

ment, and the court finds that the moving party is not entitled thereto, but that the other party is so entitled, it would seem that the court has the power to enter the proper judgment, although a cross motion therefor was not made. Rule 54(c) gives the court the power to enter a final judgment to which the prevailing party is entitled, even if the party has not demanded such relief in his pleadings.... So where one party has invoked the power of the court to render a summary judgment against his adversary, it is reasonable that this invocation gives the court power

to render a summary judgment for his adversary if it is clear that the case warrants that result.

6 Moore's Federal Practice, ¶ 56.12 at p. 56–331 (2d edition 1976). A number of courts have invoked this power to grant summary judgment to the non-moving party, so long as the summary judgment motion is party-generated. *See Betts v. Coltes,* 467 F.Supp. 544 (D.Haw. 1979); *Moss v. Ward,* 450 F.Supp. 591 (W.D.N. Y.1978). *See also Choudhry v. Jenkins,* 559 F.2d 1085, 1088–89 (7th Cir. 1977).

ly sent to the FNBC office in Chicago.[2] Plaintiff then demanded payment from FNBC–AD and was refused. This lawsuit is the result of plaintiff's efforts to obtain payment from FNBC's home office. In its complaint and supporting memoranda, plaintiff sets forth two principal theories for recovery against the bank. First, it argues that according to the terms of the letter of credit, FNBC–C was a "confirming bank" and was thereby directly obligated on the credit. Plaintiff also argues that even if FNBC–C was not a confirming bank, it is still liable on the theory that the home office is ultimately responsible for the wrongful refusal of its branches to make good on their obligations.[3] Defendant takes issue with both theories and further argues that the case should be dismissed on the ground that plaintiff· has failed to join Consolidated, which, while an indispensible party to the suit, is outside the jurisdiction of this court.

## II. Discussion

■ Whether FNBC–C was a confirming bank[4] is a question of intent of the parties to be derived from the letter of credit itself. *See Barclays Bank v. Mercantile National Bank*, 481 F.2d 1403 (5th Cir. 1973). The letter of credit itself gives no indication that the parties intended FNBC–C to play such a role. The only mention of FNBC–C in the document is in connection with the instructions to the negotiating bank for obtaining reimbursement. Insofar as the conduct of the parties is relevant in determining their intent,[5] it is apparent that both plaintiff and defendant considered FNBC–C no more than a reimbursing agent. In a December 30, 1978, telex to plaintiff, FNBC–AD advised plaintiff that it had received plaintiff's drafts and stated that, " . . . we authorize you to reimburse yourselves through FNBC–C on due date." Complaint, Ex. F. Plaintiff itself adopted this characterization of FNBC–C's role when it telexed defendant that, "we are in possession of duly authenticated instructions from your Abu Dhabi Branch, authorizing us reimbursement from you for the full amounts . . . ." Complaint, Ex. H. While FNBC–C's role as reimbursing bank may not be *ipso facto* inconsistent with its playing the part of confirming bank, we can find no evidence that it was intended to perform the latter function.

■ FNBC–C may nevertheless be liable on the credit by virtue of its status as home office. As a general rule of corporate law, obligations undertaken by a branch of the corporation are obligations of the corporation itself. *See generally*, Heininger, *Liability of United States Banks for Deposits Placed In Their Foreign Branches*, 11 Law & Policy In International Business 903, 924

2. Prior to the ruling of the Abu Dhabi court, FNBC–AD had authorized FNBC–C to reimburse plaintiff for the first three drafts totalling $87,471.04. Accordingly, on October 15, 1979, FNBC–C advised plaintiff by telex that its account had been credited. Plaintiff's Memo, Ex. A. Defendant claims, however, that the telex was prematurely sent and that plaintiff's account was never credited since, prior to posting the credit, FNBC–C received a countermanding order from FNBC–AD. Pecora Affid.

3. Plaintiff sets forth two other theories of recovery. It argues that under the doctrine established in *J. Zeevi & Sons v. Grindlays Bank (Uganda) Ltd.*, 37 N.Y.2d 220, 371 N.Y.S.2d 892, 899, 333 N.E.2d 168, 173 (1975), it is entitled to attach any funds FNBC–AD deposited in FNBC–C. Plaintiff also claims that FNBC is at least liable on the three drafts which it allegedly credited to plaintiff's account and subsequently withdrew. See note 2. In view of our reliance on plaintiff's theory that defendant is liable as the home office, *infra*, we do not reach these alternative theories.

4. A confirming bank is "a bank which engages either that it will itself honor a credit already issued by another bank or that such a credit will be honored by the issuer or a third bank." Ill.Rev.Stats. Ch. 26, § 5–103. Article 3 of the Uniform Customs and Practices for Documentary Credit (1974 rev.) contains a similar provision.

5. A letter of credit is interpreted as any other contract. *Barclays Bank v. Mercantile National Bank*, 481 F.2d 1224, 1234 (5th Cir. 1973); *Venizelos, S.A. v. Chase Manhattan Bank*, 425 F.2d 461, 465–466 (2d Cir. 1970). In interpreting a contract, a court may look to the construction given the terms by the parties. 3 Corbin on Contracts § 558 (1960); *see also* Ill.Rev.Stats. ch. 26, § 2–208.

et seq. (1979). As applied to banking corporations, this general rule of corporate responsibility is limited by the so-called "separate entity" doctrine. According to this doctrine, a branch bank is "not a mere teller's window" for the home office, but is, for certain purposes, a distinct business entity. *Pan American Bank & Trust Co. v. National City Bank*, 6 F.2d 762 (2d Cir.), *cert. denied*, 269 U.S. 554, 46 S.Ct. 18, 70 L.Ed. 408 (1925). The "separate entity" doctrine grew out of the need to protect banks from the burdens and the risks that would result if depositors were able to withdraw funds from any branch. Under such circumstances, the burden would be on the bank to notify all other branches of the withdrawal and failure to do so would create the risk of multiple withdrawals on the same funds. *See* Heininger, at 934–944. In the international setting, the doctrine is also justified by the fear that banks would suffer double liability on claims against its foreign branches: there is no guarantee that a foreign government will accept the settling of accounts in the United States as a defense to claims against the branch operating within its borders. *Id.*

In reliance on the "separate entity" doctrine, it has been held that a creditor may not attach assets of his debtor deposited in a branch by serving a writ of attachment on the home office [6]; that money deposited at one branch is redeemable only at that branch;[7] and that one branch may not use a debt which a creditor owes another branch as a set off against a debt it owes the creditor.[8] In the instant case, FNBC–C invokes the "separate entity" doctrine in an effort to avoid payment on the letter of credit issued by its Abu Dhabi branch.

The "separate entity" doctrine is not a rigid rule that protects the home office from liability in every instance. Even defendant admits that, the doctrine notwithstanding, a home office may be liable for the "wrongful refusal" of one of its branch-

es to live up to its obligations. Defendant's Reply Memorandum 3. Defendant argues, however, that the conduct of FNBC–AD in failing to authorize payment on the letter of credit may not fairly be characterized as wrongful. Defendant points out that FNBC–AD has been restrained by an order of the Abu Dhabi Civil Court which the branch unsuccessfully appealed. Defendant concludes that its branch's refusal to pay "is not 'wrongful' in the United Arab Emirates; and for that reason, it is not 'wrongful' in the United States." Defendant's Reply Memorandum 5.

While this reasoning is not without some force, we think that defendant misconstrues the concept of "wrongful refusal." Analysis of the home bank's responsibility for the "wrongful" acts of its branch begins with *Sokoloff v. National City Bank*, 250 N.Y. 69, 164 N.E. 745 (1927). In that case, plaintiff deposited $30,225.00 in the National City Bank in New York City in June of 1917, upon the bank's promise that it would open an account for plaintiff in its Petrograd branch. The account in Petrograd was duly opened and remained so until November of 1917, when plaintiff requested that the money in the account be transferred through the State Bank to a bank in Kharkoff where plaintiff resided. Upon receiving the request, the Petrograd branch communicated it to the State Bank. A few days later, Sokoloff sent another letter to the Petrograd bank, relating that the money had not yet been received in Kharkoff and advising the branch to hold the funds for Sokoloff's sister who would call for them immediately. The branch then wrote the State Bank to inquire about the transfer and was told that, due to civil disorders, it was impossible to determine whether the transfer had been effected. The branch then advised Sokoloff that the transfer had already been made and that the funds were out of its hands. Demands were made on the branch by the sister, to no avail. In

---

**6.** *Det Bergenske Dampskibsselskab v. Sabre Shipping Corp.*, 341 F.2d 50 (2d Cir. 1965).

**7.** *Chrzanowska v. Corn Exchange Bank*, 173 App.Div. 285, 159 N.Y.S. 385 (1916).

**8.** *Republic of China v. National City Bank*, 208 F.2d 627 (2d Cir. 1953).

April of 1918, the State Bank informed the Petrograd bank that the transfer had not gone through. The branch never passed this information on to Sokoloff and in September of 1918, the branch was closed and its assets seized by the revolutionary government.

Sokoloff then filed suit in New York against the home office for the amount of his Petrograd deposits. The Court of Appeals held the home bank liable, principally on the theory that after April 1918, the branch knew that its account had been re-credited by the State Bank and that, while the bank was not required by law to notify Sokoloff, he was justified in expecting notice of this fact so that he could withdraw his funds.[9] The court was not unmindful of defendant's difficult position:

> The contract between Sokoloff and the bank was to pay rubles at the Petrograd branch whenever he demanded them. They were to be held there, under contract, on his call. Should the bank fail to meet the depositor's demand . . . the contract would be broken. When the bank ceased to do business so that Sokoloff, who wanted his money, could not make a demand and could not draw upon his account, the contract was broken. The facts, however, cannot escape us. The bank did not willfully breach its contract; all its property was seized by the Soviet government.

*Sokoloff,* 164 N.E. at 749.

Since the bank's refusal to meet the demand was the product of the "turbulence and confusion following in the wake of revolutions," 164 N.E. at 749, the bank's failure was not wrongful in the sense that it was culpable. If the failure to pay was wrongful at all, it was in the elementary sense that the branch had a contract with Sokoloff which it failed to keep.[10]

It is in this sense that the liability of FNBC–C must be evaluated. Its branch in Abu Dhabi entered into a contract in reliance on which the Banco de Vizcaya negotiated a credit. FNBC–AD broke the contract, albeit through no fault of its own. The *Sokoloff* case stands for the proposition that in such circumstances, the fact that the branch is a separate entity should not shield the parent bank from liability.

The policy concerns underlying the separate entity doctrine do not compel a different result. Bookkeeping problems do not exist, since this case does not involve a general deposit redeemable at any branch; here only one branch is involved. It might be argued, however, that the threat to FNBC of double liability is substantial. If we compel FNBC–C to pay plaintiff, the funds held by FNBC–AD in the segregated account will not be released. If Consolidated prevails in its contract action against Mundus, the Civil Court of Abu Dhabi ostensibly intends to award damages to Consolidated from the impounded funds. The question is thus presented whether the possibility of doubt liability is sufficient grounds to insulate the home office from liability where its branch has failed to meet its obligations. We believe it is not. By doing business in Abu Dhabi, defendant not only reaps the benefits of the trade there but also incurs the attendant risks. The current dispute, which in defendant's view is the result of the peculiarities of Islamic law, could fairly be characterized as a cost of doing business under a foreign sovereign. To rule otherwise would shift the risk of doing business in Abu Dhabi to a party which had relatively little involvement with that forum. Plaintiff recognized the risks of conducting business in Abu Dhabi and sought to avoid them by bargaining for the

---

9. Even if Sokoloff had been immediately notified of the recrediting of his account, he would not have been able to withdraw his funds, since the Provisional Government had placed a ceiling of 150 rubles per month on withdrawals. *Sokoloff v. First National City Bank,* 130 Misc. 66, 224 N.Y.S. 102, 112 (Sup.Ct.1927).

10. The court noted that it may have reached a different result if the Russian government had been recognized at the time of the seizure. 164 N.E. at 749. Had the government been recognized, its acts may have been unreviewable by United States courts under the "act of state" doctrine. *See generally,* Heininger, at 950 *et seq.* For a discussion of the relevance of this doctrine to the instant case, see *infra* note 11.

right to be reimbursed in dollars in Chicago. Defendant's branch assumed these risk by agreeing to the reimbursement terms.

■ Defendant makes a further effort to escape the holding of *Sokoloff*. It argues *Sokoloff* should not provide the rule for decision since in that case the funds were seized by a hostile executive while, in the case at bar, they were seized pursuant to a judicial decree. Defendant argues that, as a judgment of a foreign court which observes due process, the decree is entitled to recognition and enforcement in this country in accordance with the principles of international law.[11]

■ In the absence of a treaty giving effect to the judgment of a foreign court, its recognition is dependent on the concept of comity.[12] *Hilton v. Guyot*, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895). But, as the Supreme Court has cautioned,

"Comity," in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

*Id.* at 163–164, 16 S.Ct. at 143. The courts of Illinois have similarly recognized that a judgment of a foreign court need not be given effect if it violates strong public policies of the forum. *Hager v. Hager*, 1 Ill. App.3d 1047, 274 N.E.2d 157, 159 (1971).[13] *Accord, J. Zeevi & Sons v. Grindlays Bank (Uganda Ltd)*, 37 N.Y.2d 220, 371 N.Y.S.2d 892, 899, 333 N.E.2d 168, 173 (1975) ("[W]here there is a conflict between our public policy and application of comity, our own sense of justice and equity as embodied in our public policy must prevail.").

■ Due regard for international duty and convenience and the public policy of this forum require us to reject the judgment of the Abu Dhabi court. The enforcement of irrevocable letters of credit is vital to international commerce and to Illinois which provides a forum for international transactions. The comments of a New

---

11. The argument that this court is bound to recognize and enforce the Abu Dhabi judgment is analogous to the argument that under the "act of state" doctrine, United States courts may not review the decrees of recognized foreign states with respect to property located within their boundaries. *See, e. g., Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). It is doubtful, however, that the "act of state" doctrine would apply to the instant case. First, the doctrine does not apply to decrees in judicial proceedings initiated by a private party rather than by the foreign government itself. *Timberlane Lumber Co. v. Bank of America, N.T. & S.A.*, 549 F.2d 597, 608 (9th Cir. 1976). Moreover, the concerns behind the doctrine, namely that judgments by United States courts should not interfere with the conduct of foreign policy by the political branches, *Sabbatino*, 376 U.S. at 423, 84 S.Ct. at 937, are not raised by the facts of this case. According to the Restatement 2d of Foreign Relations Law § 41, the "act of state" doctrine should apply only when the United States courts are faced with conduct through which a foreign sovereign seeks to "give effect to its public interest." The comments to § 41 point out that a foreign government rarely gives effect to its public interest through a court decree settling a private dispute. This seems to hold true in the instant

case. We further note that our ruling on the letter of credit will not in the least handicap the courts of the United Arab Emirates from fashioning a remedy against Mundus.

12. In determining whether federal courts should recognize foreign judgments, it is not clear whether the court is to apply state or federal conflicts laws. *See generally* Von Mehren & Patterson, *Recognition and Enforcement of Foreign Court Judgments In The United States*, 6 Law & Policy In International Business 37, 38–40 (1974). Federal law controls where a case involves "the competence and function of the Judiciary and the National Executive in ordering our relationships with other members of the international community...." *Sabbatino*, 376 U.S. at 425, 84 S.Ct. at 938. As stated *supra* at note 11, this case does not appear to implicate the interests of the political branches; rather, the issue to which the foreign judgment relates is purely one of contract and we therefore look to state law. *See Republic of Iraq v. First National Bank of Chicago*, 350 F.2d 645, 648 (7th Cir. 1965).

13. *See also* Restatement 2d of Conflict of Laws, § 98, comment g and § 117, comment c; Von Mehren & Patterson, at 61–63.

York court regarding that forum's interest in maintaining the integrity of international letters of credit are equally applicable here:

> In this instance, New York was the locus of repudiation, whereas it should have been a site of payment. The provision respecting reimbursement in New York was an integral part of that for which the parties bargained, it was not a discrete obligation. . . . The value to those in commerce of having a place at a financial capital where funds can be obtained on a simple letter of credit, away from a relatively small bank in an undeveloped country of uncertain political stability is obvious. The reimbursement provision is quite essential economically, to the total arrangement since a promisee would be unwilling to present a draft based on a letter of credit, in dollars terms, to a commercial house in the United States and then be required to wait a relatively inordinate time for the money to come from a remote source.

*J. Zeevi & Sons,* 371 N.Y.S. at 897–898, 333 N.E.2d at 172. The public interest in enforcing irrevocable letters of credit and providing a safe and reliable haven for international letters of credit and for international trade in Illinois is manifest. Moreover, to follow the Abu Dhabi ruling would not only compromise the public interest of this state, but would violate the recognized conventions of international trade. *See* Uniform Customs and Practices for Documentary Credit (1974 rev.).

We turn, then, to the relevant Illinois law, which controls the outcome of this case. Ill.Rev.Stats. ch. 26, § 1–105(1)[14] provides that parties to a contract may agree which law will govern disputes. The parties to the letter of credit expressly agreed to be governed by the Uniform Customers and Practices for Documentary Credits (1974 rev.). That code states

> Payment, acceptance or negotiation against documents which appear on their face to be in accordance with the terms and conditions of a credit by a bank authorized to do so, binds the party giving the authorization to take up the documents and reimburse the bank which has effected the payment, acceptance or negotiation.

*Id.,* Article 8, b. Having issued an irrevocable letter of credit and having wrongfully refused to honor it, defendant's Abu Dhabi branch, and therefore defendant itself, are liable on the full amount. We are prepared to grant summary judgment to plaintiff in this action. However, one further point must be addressed. Defendant argues that this action cannot proceed in the absence of Consolidated.

Fed.R.Civ.P. 19(a) provides that a person subject to the court's jurisdiction shall be joined if

> (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

Rule 19(b) states that if a person described in Rule 19(a) cannot be joined, "[t]he court shall determine whether in conscience the actions should proceed among the parties before it, or should be dismissed, the absent

---

14. Ill.Rev.Stats. ch. 26, § 1–105 provides: "Except as provided hereafter . . . when a transaction bears a reasonable relation to this State and also to another state or nation the parties may agree that the law either of this State or of such other state or nation shall govern their rights and duties. Failing such agreement, this Act applies to transactions bearing an appropriate relation to this State." Although the law the parties agreed to, namely the Uniform Customs and Practices for Documentary Credits, is not the law of another state or nation, we find no reason not to give effect to the parties intentions. The rights of third parties are not prejudiced by this choice of law. *See* Illinois Code Comment, Subsection (1) to Ill.Rev.Stats. ch. 26, § 1–105. Moreover, the parties have voiced no due process objections to the application of the Uniform Customs and Practices to this litigation.

person being thus regarded as indispensible."

We do not find that Consolidated is a party which should be joined under Rule 19(a). The instant action is based on an irrevocable letter of credit. Under Article 8 of the UCP, liability on such a credit is adjudicated independently of the underlying contract,[15] *Accord,* Ill.Rev.Stats. ch. 26, § 5–114(1). *See also* Illinois Code Comment to § 5–109, Subsection (1). Thus, Consolidated, as a party to the underlying contract, need not be present in this case in order for complete relief to be afforded. For the same reason, Consolidated does not have an interest relating to the subject of the case. Its interest is only in recovery on the underlying contract and "the customer will normally have direct recourse against the beneficiary if performance fails . . . ." Uniform Commercial Code § 5–109, Comment 1. Further, a ruling in this case will have no bearing on Consolidated's ability to protect its contractual interests in the Abu Dhabi proceeding. It might be argued that disposition of this case may subject FNBC to a substantial risk of double liability or inconsistent obligations; however, Consolidated's participation in this action will not lessen these risks since this court may not prevent Consolidated from pressing its claim in Abu Dhabi. The risk of double liability is plainly not the result of the absence of any party, but the result of the mistaken interpretation of letters of credit given by the Abu Dhabi court. We therefore find that Consolidated does not fit the description of a party that should be joined under Rule 19(a). Consequently, according to the language of Rule 19(b), the action should not be dismissed.[16]

Even if Consolidated met the requirements of Rule 19(a), we still would not dismiss the case under Rule 19(b). Dismissal of the case would force plaintiff to pursue its claim in the Abu Dhabi courts,[17] which clearly do not understand letter of credit transactions. Such a ruling would effectively deprive plaintiff of any forum in which to press its claim. *See* Fed.R.Civ.P. 19(b) (providing that in deciding to dismiss the case, the court should determine "whether the plaintiff will have an adequate remedy if the action is dismissed for non-joinder."). Since none of the other factors cited in Rule 19(b) for the court's consideration are applicable here,[18] we would find that "in equity and good conscience," the case should not be dismissed.

We therefore enter summary judgment in plaintiff's favor.

---

**15.** Article 8 of the Uniform Customs and Practices for Documentary Credits provides that "[I]n documentary credit operations, all parties concerned deal in documents and not in goods."

**16.** Rule 19(b) states that the court may order dismissal only "[I]f a person as described in subdivision (a)(1)–(2) hereof cannot be made a party . . . ."

**17.** This is the expressed intent behind defendant's motion to dismiss. Defendant's Reply Memo. 11.

**18.** Other factors under Rule 19(b) are (1) to what extent a judgment rendered in Consolidated's absence would prejudice it or those already parties; (2) the extent to which by shaping relief, prejudice can be avoided; and (3) whether a judgment rendered in Consolidated's absence will be adequate. We have already stated that Consolidated will not be prejudiced by our ruling in this case and that, even in its absence, we can grant adequate relief. FNBC may be subject to double liability regarding the transaction, but, again, that is not due to Consolidated's absence and could not be obviated by its presence.