(173 App. Div. 285)
### CHRZANOWSKA v. CORN EXCH. BANK.

(Supreme Court, Appellate Division, First Department.    June 2, 1916.)

1. ASSIGNMENTS ⬤➡49—EQUITABLE ASSIGNMENTS—CHECK.
    A check is not an assignment pro tanto of the fund on deposit to the credit of the drawer.
    [Ed. Note.—For other cases, see Assignments, Cent. Dig. §§ 85–98; Dec. Dig. ⬤➡49.]

2. BANKS AND BANKING ⬤➡139—PAYMENT OF CHECKS—REVOCATION—DEATH OF DRAWER.
    Death of drawer of check revokes the authority of the payee to collect it and of the bank to pay it, except that if the bank pays in good faith and without notice of the death it is protected.
    [Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 406–409; Dec. Dig. ⬤➡139.]

3. BANKS AND BANKING ⬤➡123—PAYMENT OF CHECKS—OBLIGATION OF BANK —ACCEPTANCE—ESTOPPEL.
    · Under Banking Law (Consol. Laws, c. 2) § 109, providing for branch banks, a bank operating branch banks as separate banks as respects the details of deposits and credits had the right to charge up against a depos itor's account in one branch a deposited and credited check drawn upon another branch by one who had died before its deposit, there being no evidence of estoppel.
    [Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 302, 308, 311; Dec. Dig. ⬤➡123.]

Appeal from Appellate Term, First Department.

Action by Priscilla Chrzanowska against the Corn Exchange Bank. From a determination of the Appellate Term, affirming a judgment for plaintiff in City Court, defendant appeals. Reversed, and judgment directed for defendant.

Argued before CLARKE, P. J., and LAUGHLIN, SCOTT, SMITH, and DAVIS, JJ.

W. H. Van Benschoten, of New York City, for appellant.
Alex. B. Greenberg, of New York City, for respondent.

LAUGHLIN, J.    The only questions with respect to the facts arising on this appeal relate to the inferences to be drawn from un-controverted testimony.    A jury was waived and the case was tried before the court.    The defendant is a domestic banking corporation, having its main banking house at William and Beaver streets and 26 branch banks all in the borough of Manhattan, New York.    One branch, known as the "Harlem Branch," is located at 125th street and Lexington avenue, and another, known as the "181st Street Branch," is at 181st street and St. Nicholas avenue.    On the 31st day of May, 1910, the plaintiff opened an account with the defendant at its Harlem Branch with a deposit of $100.    She made no further deposit until January 11, 1911, at which time the balance to her credit was only $3.25.    One J. Antoni Chrzanowski, who was plaintiff's brother-in-law, had a deposit account with the defendant at its 181st Street Branch. On the 9th day of January, 1911, he drew and delivered to plaintiff a check for $1,500 on defendant's 181st Street Branch, and he died at

midnight the day after. After his death, and at 10 o'clock on the morning of the 11th, plaintiff presented the check, indorsed by her, and a deposit ticket, with her passbook, at the receiving teller's window of the defendant's Harlem Branch, and according to her testimony, which is not controverted, asked the teller if she could cash the check that morning, as she needed the money, whereupon he asked to wait a minute, saying that he would find out, and after disappearing he "came back in a little while" and said, "You are credited with this, you may draw to-day," or "You may draw right away," and entered it on her passbook, and it was also entered on her account on the ledger of the bank. She did not draw against it then, or that day, but returned the next day and presented a check for $100, which was paid without question according to her testimony, and as matter of favor after consultation by the paying teller with the manager of the Branch Bank according to the testimony of the manager.

The usual course of business when a check by a depositor in one of its branches was presented to another branch by a depositor in that branch was to forward the check for collection through the main bank to the branch on which it was drawn, and the check for $1,500 was so forwarded. When it was presented at the 181st Street Branch, the manager discovered that it would overdraw the account of the drawer, whose signature appeared to be "shaky," and in attempting to communicate with the drawer he was informed of the death. The check was then returned unpaid through the same channel to the Harlem Branch, and on the 13th of January the plaintiff was notified that on account of the death of the drawer the check had been returned unpaid, and she was further notified the next day that it had been charged back to her account, and on the 17th she was requested to make a deposit to make good the overdraft. On the 23d she requested the Harlem Branch by letter to hold the matter in abeyance until she could give it attention. On the 15th of February she was again requested by letter to give the matter her immediate attention. The next heard from her by the bank was in 1913, when according to her testimony she called on the manager of the Harlem Branch and asked the reason why the check had not been credited to her account. In the meantime the widow of the drawer, to whom by will he left all his property, had qualified as his executrix, and without notice to plaintiff had been permitted to withdraw the balance to his credit in the 181st Street Branch, after action brought. This action was commenced on the 3d day of December, 1914, to recover the balance of the plaintiff's account as it stood before the check was charged back to the account.

It is argued that the teller of the Harlem Branch, after leaving the window when plaintiff inquired whether she could cash the check before entering the deposit on her pass book, probably communicated with the 181st Street Branch to ascertain whether the drawer's account was good for the amount; but there is no evidence of that fact, and, if he had done so, it is a reasonable inference that he would have discovered that the account was not good for that amount, as that was the fact. The fact that the plaintiff did not then draw against the account shows that for some reason she conceived the idea that she would derive some special benefit or advantage if the

bank would cash the check notwithstanding the fact that she did not intend to take the money, for she asked to have it cashed and that she be given credit for it, and that, in effect, is the theory upon which her learned counsel endeavors to sustain the recovery, for he argues that the bank, in effect, agreed to cash the check, and the transaction is to be deemed the same as if it had paid the money over to her, and she had deposited it in her account. That, however, is not the reasonable inference which the teller of the bank was justified in drawing, for, instead of presenting the check and asking to have the money paid over, she presented her passbook and a deposit ticket, and asked to have the check cashed, and that she be given credit for it. Inasmuch as she did not desire the money at that time, the explanation of her conduct presented by the evidence is that she knew that the drawer of the check was dead, and that there might be some question about the collection of it, and therefore she desired to have it understood that it was cashed and placed to her credit, but she failed to disclose to the teller of the bank the fact that the drawer was dead. No one connected with the bank was at that time aware of the death of the drawer of the check.

[1-3] A check is not the assignment of the fund on deposit to the credit of the drawer pro tanto, and the holder is merely the agent of the drawer for the purpose of collecting it, and upon the death of the drawer before presentation the authority of the holder is revoked, and the bank is no longer authorized to pay; but on principles of necessity incident to the banking business, if the bank pays in good faith and without notice of the death of the drawer, it is protected. Glennan v. Rochester Trust & Safe Deposit Co., 209 N. Y. 12, 102 N. E. 537, 52 L. R. A. (N. S.) 302, Ann. Cas. 1915A, 441. If the plaintiff did not know the law, and acted in good faith in failing to disclose the death of the drawer, then the teller, in crediting the check to the plaintiff's account, acted under a mistake of a material fact; and if the plaintiff knew the law, and purposely concealed the death of the drawer from the teller, she perpetrated a fraud on the bank, and in either case she obtained a credit to which she was not entitled, for in any event her authority to collect the check had been revoked by the death of the drawer. Much stress is laid by the learned counsel for the respondent on the fact that the check was credited to plaintiff's account, and that she was informed by the receiving teller that she could draw against it. The only significance of that is its bearing on the question as to whether the check was accepted and credited to the plaintiff's account unconditionally, or received for collection and credited to her account, subject to being charged back if not paid, for manifestly these facts present no evidence of estoppel upon which it could be held that the bank could not thereafter be heard to say that the plaintiff might not draw the undrawn balance of the credit it gave her on the check. The existence of evidence of an estoppel was one of the controlling facts in Oddie v. National City Bank, 45 N. Y. 735, 6 Am. Rep. 160, which the learned trial court deemed decisive in favor of the plaintiff, and we have heretofore had occasion to point that out in distinguishing that authority. See Republic Life Ins

Co. v. Hudson Trust Co., 130 App. Div. 618, 115 N. Y. Supp. 503. In Oddie v. National City Bank, supra, the check which was credited to the account of a depositor was drawn on the same bank, and the state of the account on which the check was drawn was known when the credit was given, and in the meantime, and before the check was charged back, the position of the depositor had changed. Here the accounts were kept in separate branch banks, and it appears by the evidence that neither branch had the signatures of the other's depositors, or records of the state of their accounts. If a bank having many branches were obliged to have duplicate signatures of all its depositors in each, and to pay on presentation at any branch checks drawn on the main bank or on any other branch, that would enormously increase the expense of conducting the banking business, and would be fraught with great risks to the bank. If the genuineness of signatures might be thus ascertained, it would be necessary in any event to communicate with the branch on which the check was drawn and have it charged up to the account there before it could be paid in safety by another branch, and endless difficulties, inconvenience, and confusion would be encountered.

Section 66 of the Banking Law requires that the business of a bank be conducted at the place specified in its certificate of incorporation, and section 31 prohibits a change of location even in the same city without the approval of the superintendent of banks. It would seem, therefore, quite clear that, without express authority elsewhere conferred by statute, a bank would have no right to establish branches. The defendant had established and was maintaining and operating branch banks under and by virtue of the provisions of section 109 of the Banking Law, and the statutory provisions from which that section was derived, which so far as material provided that a bank "may open and keep [open] one or more branch offices in such city for the receipt and payment of deposits and for making loans and discounts to the customers of such branch offices only." The defendant required its depositors to agree to draw their checks on the particular branch in which they were depositors, and the checks were so drawn and the accounts were so kept. With respect to the question presented for decision, the different branches were as separate and distinct from one another as from any other bank. The Legislature did not intend, we think, either to authorize or require a bank having branches to cash checks and make loans to a depositor at any branch at which he may see fit to call, for to do so would produce endless confusion, and the statutory provisions quoted do not require such a construction. If the check had been drawn on another bank, there could be no doubt but that such other bank not only might, but it would have been its duty to, refrain from paying the check if it had notice of the death of the drawer. Glennan v. Rochester Trust & Safe Deposit Co., supra. If the check had been drawn upon and returned by another bank, the rule is well settled that the defendant would have had the right to charge it up against the depositor's account. Balbach v. Frelinghuysen (C. C.) 15 Fed. 675; Stein v. Empire Trust Co., 148 App. Div. 850, 133 N. Y. Supp. 517; Michie on Banks and

Banking, § 163; Citizens' State Bank v. Cowles, 180 N. Y. 346, 73 N. E. 33, 105 Am. St. Rep. 765. I am of opinion that that rule should be applied here.

It follows that the determination of the Appellate Term and the judgment of the City Court should be reversed, with costs in all courts to appellant, and the findings of fact and conclusions of law made by the trial court inconsistent with these views should be reversed, and appropriate findings and conclusions in accordance with these views made, and judgment should be entered in favor of the defendant on its counterclaim for the overdraft of the account, together with interest thereon, and costs of the action. All concur.