==================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
------------------------------------------------------------------
No. 162
Motorola Credit Corporation,
          Appellant-Respondent,
Nokia Corporation,
          Plaintiff-Counter-
          Defendant,
Motorola, Inc., et al.,
          Counter-Defendants,
        v.
Standard Chartered Bank,
          Respondent-Appellant,
Murat Hakan Uzan, et al.,
          Defendants-Counter-
          Claimants,
Kemal Uzan, et al.,
          Defendants.



          Howard H. Stahl, for appellant-respondent.
          Bruce E. Clark, for respondent-appellant.
          Institute of International Bankers et al.; Government
of the United Kingdom of Great Britain and Northern Ireland;
Central Bank of Jordan; Committee on Banking Law of the
Association of the Bar of the City of New York; Securities
Industry and Financial Markets Association, amici curiae.



GRAFFEO, J.:

          In this case, the United States Court of Appeals for

the Second Circuit asks us whether the "separate entity" rule

prevents a judgment creditor from ordering a garnishee bank

operating branches in New York to restrain a judgment debtor's

assets held in foreign branches of the bank.  We conclude that it

- 1 -

does.

I.

Between April 1998 and September 2000, several members of the Uzan family (the Uzans) induced plaintiff Motorola Credit Corporation (Motorola) to loan over $2 billion to a Turkish telecommunications company they controlled, purportedly to finance a major expansion of the company's operations. Unbeknownst to Motorola, the Uzans diverted a substantial portion of these funds to themselves and other entities they controlled. In 2003, after discovering that the Uzans had "perpetrated a huge fraud" and concealed "their scheme through an almost endless series of lies, threats, and chicanery," the United States District Court for the Southern District of New York entered a judgment in Motorola's favor for compensatory damages of about $2.1 billion (Motorola Credit Corp. v Uzan, 274 F Supp 2d 481, 490 [SDNY 2003]). Three years later, the District Court awarded Motorola an additional $1 billion in punitive damages (see Motorola Credit Corp. v Uzan, 413 F Supp 2d 346 [SDNY 2006]).

The Uzans have gone to great lengths to avoid satisfying the judgments and remain in contempt for failure to comply with the District Court's orders, subjecting them to arrest if they enter the United States. As a result of enforcement obstacles, Motorola has pursued collection of the judgments through third-party discovery and the District Court has conducted postjudgment proceedings ex parte and under seal.

In February 2013, the District Court entered an order pursuant to Federal Rules of Civil Procedure 65 and 69 and CPLR 5222 restraining the Uzans and anyone with notice of the order from selling, assigning or transferring their property.

Motorola served the restraining order on the New York branch of defendant Standard Chartered Bank (SCB), a foreign bank incorporated and headquartered in the United Kingdom.  SCB, which had no connection to Motorola's loan to the Uzans or the underlying litigation, did not locate any Uzan property at its New York branch.  Two months later, a global search of its branches revealed Uzan-related assets valued at roughly $30 million in its branches in the United Arab Emirates (U.A.E.).  SCB froze those assets in accordance with the restraining order, but regulatory authorities in the U.A.E. and Jordan quickly intervened.  The Central Bank of Jordan sent a bank examiner to seize documents at SCB's Jordan branch, while the U.A.E. Central Bank unilaterally debited about $30 million from SCB's account with the bank.

In May 2013, SCB sought relief from the restraining order, claiming in the District Court that the restraint of the $30 million in assets violated U.A.E. law and subjected it to double liability.  SCB also contended that, under New York's separate entity rule, service of the restraining order on SCB's New York branch was effective only as to assets located in accounts at that branch and could not freeze funds situated in

foreign branches.  In opposition, Motorola asserted that the separate entity rule was no longer valid law in light of Koehler v Bank of Bermuda Ltd. (12 NY3d 533 [2009]), where we held that a judgment creditor could seek the turnover of stock certificates located outside the country so long as the court had personal jurisdiction over the garnishee.  In a sealed order, the District Court agreed with SCB and concluded that the separate entity rule precluded Motorola from restraining assets at SCB's foreign branches.  Nevertheless, the District Court stayed the release of the restraint pending the outcome of Motorola's appeal.

The Second Circuit, recognizing that we have never explicitly addressed the separate entity doctrine and finding that its viability was unclear in the wake of Koehler, certified the following question to us:

> "[W]hether the separate entity rule precludes a judgment creditor from ordering a garnishee bank operating branches in New York to restrain a debtor's assets held in foreign branches of the bank" (740 F3d 108, 118 [2d Cir 2014]).

We accepted certification (22 NY3d 1113 [2014]).[1]

II.

Motorola, as the judgment creditor, argues that the service of a CPLR 5222 restraining notice on the New York branch

---

[1]  The Second Circuit also certified a related question in a companion case involving the application of the separate entity rule in the CPLR 5225 turnover context (see Tire Eng'g & Distrib. v Bank of China Ltd., 740 F3d 108 [2d Cir 2014]), but that certified question was later withdrawn (22 NY3d 1152 [2014]).

of a foreign bank garnishee is sufficient to freeze the funds of the judgment debtor in any branch account with the bank, regardless of where the assets are located.  Motorola questions whether the separate entity rule, which is not mentioned in CPLR article 52, was ever the law of New York and asserts that, even if it was, we necessarily abolished it in Koehler.  In any event, Motorola asks us to disavow the separate entity doctrine as outmoded and unnecessary.

As the garnishee bank, SCB responds that the separate entity rule is deeply rooted in New York banking law and that foreign banks have reasonably relied on it over the years when deciding whether to open branches and conduct business in New York.  Supported by several amici curiae, SCB asserts that Koehler did not discard the separate entity rule and urges that the rule remains vital in the context of international banking. Unlike our dissenting colleagues, we conclude that SCB has the better argument.

The separate entity rule, as it has been employed by lower New York courts and federal courts applying New York law, provides that even when a bank garnishee with a New York branch is subject to personal jurisdiction, its other branches are to be treated as separate entities for certain purposes, particularly with respect to CPLR article 62 prejudgment attachments and article 52 postjudgment restraining notices and turnover orders (see Matter of National Union Fire Ins. Co. of Pittsburgh, Pa. v

Advanced Empl. Concepts, 269 AD2d 101 [1st Dept 2000]; Therm-X-Chem. & Oil Corp. v Extebank, 84 AD2d 787 [2d Dept 1981]; Allied Mar., Inc. v Descatrade SA, 620 F3d 70, 74 [2d Cir 2010]).  In other words, a restraining notice or turnover order served on a New York branch will be effective for assets held in accounts at that branch but will have no impact on assets in other branches.[2]

Courts and commentators traditionally have ascribed three basic rationales for the separate entity doctrine.  First, courts applying the rule have emphasized the importance of international comity and the fact that "any banking operation in a foreign country is necessarily subject to the foreign sovereign's own laws and regulations" (Global Tech., Inc. v Royal Bank of Can., 34 Misc 3d 1209[A], 2012 NY Slip Op 50023[U], *3 [Sup Ct, NY County 2012] [internal quotation marks and citation omitted]).  Second, it was viewed as necessary to protect banks from being "subject . . . to competing claims" and the possibility of double liability (Shaheen Sports, Inc. v Asia Ins. Co., Ltd., 2012 WL 919664, *5 [SDNY 2012]), a concern strenuously voiced by the amici in this case.  And third, the rule has been

---

[2]  Most cases applying the separate entity rule involved bank branches in foreign countries, but some have applied the rule to bar a restraint even where the unserved branch is located in New York (see e.g. Det Bergenske Dampskibsselskab v Sabre Shipping Corp., 341 F2d 50, 53-54 [2d Cir 1965]).  In this case, we have no occasion to address whether the separate entity rule has any application to domestic bank branches in New York or elsewhere in the United States.  The narrow question before us is whether the rule prevents the restraint of assets held in foreign branch accounts, and we limit our analysis to that inquiry.

justified based on the "intolerable burden" that would otherwise be placed on banks to monitor and ascertain the status of bank accounts in numerous other branches (Cronan v Schilling, 100 NYS2d 474, 476 [Sup Ct, NY County 1950], affd without opn 282 App Div 940 [1st Dept 1953]; see generally Geoffrey Sant, The Rejection of the Separate Entity Rule Validates the Separate Entity Rule, 65 SMU L Rev 813, 814 [2012]).

The existence of the separate entity rule as a component of New York's common law can be traced back to a 1916 decision (see Chrzanowska v Corn Exch. Bank, 173 App Div 285, 291 [1st Dept 1916], affd without opn 225 NY 728 [1919] ["With respect to the question presented for decision, the different branches were as separate and distinct from one another as from any other bank."]).  It was first applied in the postjudgment context a few decades later in Walsh v Bustos, where the court concluded that a restraining order served on a New York branch of the bank garnishee did not "extend to the deposits of the judgment debtor in the Mexican branch of this foreign bank" (46 NYS2d 240, 241 [City Ct, NY County 1943]).  By the 1950s and 1960s, the separate entity rule was described by state and federal courts as "well established" (Cronan, 100 NYS2d at 476) and supported by "a consistent line of authority" (Det Bergenske Dampskibsselskab v Sabre Shipping Corp., 341 F2d 50, 53 [2d Cir 1965]).  And its endurance continues into the 21st century in the postjudgment context (see Gliklad v Bank Hapoalim B.M., 2014 WL

3899209 [Sup Ct, NY County 2014]; Parbulk II AS v Heritage Mar.,
SA, 35 Misc 3d 235, 238-239 [Sup Ct, NY County 2011]; Fidelity
Partners, Inc. v Philippine Export & Foreign Loan Guar. Corp.,
921 F Supp 1113, 1119-1120 [SDNY 1996]).  Although we have not
expounded on the separate entity rule,[3] contrary to Motorola's
suggestion, it is a firmly established principle of New York law,
with a history of application both before and after the 1962
adoption of the CPLR.

Motorola argues that we abrogated the rule five years
ago in Koehler v Bank of Bermuda Ltd. (12 NY3d 533 [2009]), a
case in which a judgment creditor secured a CPLR 5225 turnover
order directing a garnishee bank in Bermuda to deliver stock
certificates belonging to the judgment debtor.  The bank
consented to personal jurisdiction based on the presence of a
subsidiary in New York.[4]  The question certified to us by the

_____

[3]  We affirmed, without opinion, in two cases involving the
separate entity rule (see McCloskey v Chase Manhattan Bank, 11
NY2d 936 [1962]; Chrzanowska v Corn Exch. Bank, 225 NY 728
[1919]).

[4]  Similarly, in this case personal jurisdiction over SCB
was predicated on the presence of its New York branch.  The
District Court noted that SCB did not dispute that personal
jurisdiction existed on this basis.  Motorola, too, asserts in
its brief that SCB "has never contested personal jurisdiction."
However, SCB now appears to challenge personal jurisdiction in
light of the U.S. Supreme Court's nascent decision in Daimler AG
v Bauman, which held that general jurisdiction over a foreign
corporation may not be predicated solely on the ground that the
corporation "engages in a substantial, continuous, and systematic
course of business" in the state (134 SCt 746, 761 [2014]
[internal quotation marks and citation omitted]).  Rather, as a

Second Circuit was "whether a court sitting in New York may order

a bank over which it has personal jurisdiction to deliver stock

certificates owned by a judgment debtor (or cash equal to their

value) to a judgment creditor, pursuant to CPLR article 52, when

those stock certificates are located outside New York" (id. at

536).  We answered that inquiry in the affirmative, concluding

that the "the Legislature intended CPLR article 52 to have

extraterritorial reach" and that "the key to the reach of the

turnover order is personal jurisdiction over a particular

defendant" (id. at 539-540).  Because the bank admitted that the

New York courts had secured personal jurisdiction over it, the

turnover order was properly directed at the stock certificates in

Bermuda.

Notably absent from our decision in Koehler was any

discussion of the separate entity rule.  We discern two reasons

for our silence on the subject.  As an initial matter, the

foreign bank did not raise the issue so we had no occasion to

examine the doctrine.  Second, the separate entity rule, as it

matter of due process, general jurisdiction exists only if the
corporation is "essentially at home in the forum State" (id.
[internal quotation marks and citation omitted]), typified by
"the place of incorporation and principal place of business" (id.
at 760).  Here, SCB observes that it is incorporated under the
laws of the United Kingdom and headquartered there.  Whether New
York has personal jurisdiction over SCB -- and whether SCB may
still litigate the federal constitutional issue at this juncture
-- are questions that must be resolved by the federal courts.
The sole issue before us on this certified question is whether
the common-law separate entity rule prevents Motorola's restraint
of assets held by SCB's foreign branches.

has been applied by the courts, would not have aided the bank in
Koehler because that case involved neither bank branches nor
assets held in bank accounts.[5]  In short, we did not analyze,
much less overrule, the separate entity doctrine in Koehler.
Nor, as the dissent believes, is the rule irreconcilable with our
holding in Koehler that the scope of CPLR article 52 is generally
tied to the exercise of personal jurisdiction over a garnishee.
As a longstanding common-law doctrine, the separate entity rule
functions as a limiting principle in the context of international
banking, particularly in situations involving attempts to
restrain assets held in a garnishee bank's foreign branches.  We
therefore reject Motorola's view that Koehler decided the issue
before us.

        Motorola and the dissent further submit that the
separate entity rule is incompatible with CPLR article 52 because
nothing in CPLR 5222, governing postjudgment restraining notices,
expressly embraces the rule.  Motorola cites Commonwealth of the
N. Mariana Is. v Canadian Imperial Bank of Commerce, where we
stated, in determining the expanse of CPLR article 52, that the
"starting point is the language itself, giving effect to the

---

        [5]  It would appear that the judgment creditor in Koehler
also served the bank itself in Bermuda, not only its New York
subsidiary, providing yet another reason for the inapplicability
of the separate entity rule in that case (see Koehler v Bank of
Bermuda Ltd., 2005 WL 551115, *12 [SDNY 2005] ["Assuming service
to be proper, the separate entity rule has no role to play in
this case."]).

plain meaning thereof" (21 NY3d 55, 60 [2013] [internal quotation marks and citation omitted]).  But Motorola's reliance on Canadian Imperial Bank is misplaced because the separate entity rule predates the CPLR by several decades and the issue is not one of statutory construction but, rather, whether to retain a common-law principle.

Finally, we decline Motorola's invitation to cast aside the separate entity rule.  As discussed, the doctrine has been a part of the common law of New York for nearly a century.  Courts have repeatedly used it to prevent the postjudgment restraint of assets situated in foreign branch accounts based solely on the service of a foreign bank's New York branch.  Undoubtedly, international banks have considered the doctrine's benefits when deciding to open branches in New York, which in turn has played a role in shaping New York's "status as the preeminent commercial and financial nerve center of the Nation and the world" (Ehrlich-Bober & Co. v University of Houston, 49 NY2d 574, 581 [1980]).

In large measure, the underlying reasons that led to the adoption of the separate entity rule still ring true today. The risk of competing claims and the possibility of double liability in separate jurisdictions remain significant concerns, as does the reality that foreign branches are subject to a multitude of legal and regulatory regimes.  By limiting the reach of a CPLR 5222 restraining notice in the foreign banking context, the separate entity rule promotes international comity and serves

to avoid conflicts among competing legal systems (see generally Daimler AG v Bauman, 134 SCt 746, 763 [2014] [recognizing the importance of considering "the risks to international comity"]). And although Motorola suggests that technological advancements and centralized banking have ameliorated the need for the doctrine, courts have continued to recognize the practical constraints and costs associated with conducting a worldwide search for a judgment debtor's assets (see Samsun Logix Corp. v Bank of China, 31 Misc 3d 1226[A], 2011 NY Slip Op 50861[U], *4 [Sup Ct, NY County 2011] [stating that "the Banks submitted numerous affidavits to the effect that the computer systems in the New York branches of the Banks do not provide access to customer account information at the head office or at branches outside of the United States."]).[6]

Indeed, as the District Court observed, the facts of this case aptly demonstrate that the policies implicated by the separate entity rule run deeper than the ability of a bank to

---

[6] As the dissent highlights, one court questioned the validity of the separate entity rule in light of computerized banking (see Digitrex, Inc. v Johnson, 491 F Supp 66 [SDNY 1980]). But courts subsequently limited the so-called Digitrex exception to cases where "(1) the restraining notice is served on the bank's main office; (2) the bank's main office and branches are within the same jurisdiction; and (3) the bank branches are connected to the main office by high-speed computers and are under the centralized control of the main office" (Limonium Mar., S.A. v Mizushima Marinera, S.A., 961 F Supp 600, 607 [SDNY 1997]; see also Matter of National Union Fire Ins. Co. of Pittsburgh, Pa. v Advanced Empl. Concepts, 269 AD2d 101, 102 [1st Dept 2000]).

communicate across branches.  In seeking to comply with the restraining order, SCB faced regulatory and financial repercussions abroad.  Representatives of the Central Bank of Jordan compelled SCB to disclose records and directed SCB to immediately unfreeze the assets.  The U.A.E. Central Bank, which possesses regulatory oversight in that nation, would not allow SCB's Uzan-related payment obligation to remain unsatisfied.  As a result, the U.A.E. Central Bank debited SCB's account with that bank for an amount equivalent to the frozen funds -- approximately $30 million.  In essence, SCB was placed in the difficult position of attempting to comply with the contradictory directives of multiple sovereign nations.

Consequently, in contrast to the dissent, we believe that abolition of the separate entity rule would result in serious consequences in the realm of international banking to the detriment of New York's preeminence in global financial affairs. For all of these reasons, we conclude that a judgment creditor's service of a restraining notice on a garnishee bank's New York branch is ineffective under the separate entity rule to freeze assets held in the bank's foreign branches.

* * *

Accordingly, the certified question should be answered in the affirmative.

Motorola Credit Corp. v Standard Chartered Bank

No. 162

ABDUS-SALAAM, J.(dissenting):

Today, in the year 2014, the majority for the first time expressly adopts the separate entity rule for post-judgment enforcement proceedings under CPLR article 52. The rule has no statutory basis and was initially formulated by the lower courts nearly a century ago based on a rationale that has no application to these modern times. In choosing this outmoded rule, the majority has engaged in improper judicial legislation, avoided the clear import of our recent decision in Koehler v Bank of Bermuda (12 NY3d 553 [2009]) and given short shrift to the compelling public policy reasons to reject such a rule.

The majority has, in this particular case, permitted the judgment debtors, individuals who owe plaintiff over $2 billion in consequential damages and $1 billion in punitive damages, who are subject to arrest orders from the United States District Court for the Southern District of New York and The English High Court of Justice, and who have been convicted of multibillion dollar bank frauds in Turkey, to evade enforcement

proceedings in New York.  As was described by the Second Circuit, "[r]elying on their vast personal wealth, the Uzans have time and again deployed their lawyers to raise legal roadblocks to the enforcement of the judgment against them.  They have persistently endeavored to evade the lawful jurisdiction of the District Court and undermine its careful and determined work" (Motorola Credit Corp. v Uzan, 561 F3d 123, 127 [2d Cir 2009]).  Standard Chartered Bank, by persuading the majority of this Court to adopt the obsolete separate entity rule, has aided its fugitive customers by erecting a monumental roadblock to plaintiff's enforcement of the staggering judgment.

In broader terms, today's holding permits banks doing business in New York to shield customer accounts held in branches outside of this country, thwarts efforts by judgment creditors to collect judgments, and allows even the most egregious and flagrant judgment debtors to make a mockery of our courts' duly entered judgments.  In an age where banks are being held more accountable than ever for their actions vis-à-vis their customers,[1] today's holding is a deviation from current public

---

[1](See e.g. USA Patriot Act, 115 Stat. 272 [2001][amending Bank Secrecy Act to, among other things, "increase the strength of United States measures to prevent, detect, and prosecute international money laundering and the financing of terrorism," "provide a clear national mandate for subjecting to special scrutiny those foreign jurisdictions, financial institutions operating outside of the United States, and classes of international transactions or types of accounts that pose particular, identifiable opportunities for criminal abuse," and "to ensure that all appropriate elements of the financial

policy regarding the responsibilities of banks and a step in the
wrong direction.

I.

## CPLR Article 52 Neither Expressly nor Impliedly Incorporates a Separate Entity Rule.

I begin my analysis of CPLR 5222 (b) with the generally
accepted premise that the "starting point" is "the language
itself, giving effect to the plain meaning thereof" (Commonwealth
of the N. Mariana Is. v Canadian Imperial Bank of Commerce, 21
NY3d 55, 60 [2013] [internal citation and quotation marks
omitted]).  The statute provides, in pertinent part, with respect
to third-parties served with a post-judgment restraining notice:

> "All property in which the judgment debtor or
> obligor is known or believed to have an
> interest then in and thereafter coming into
> the possession or custody of such a person,
> including any specified in the notice, and
> all debts of such a person, including any
> specified in the notice, then due and
> thereafter coming due to the judgment debtor
> or obligor, shall be subject to the notice."

Nothing in the statute exempts third parties that are
banks, or branches of banks, from complying with the restraining
notice. As the Second Circuit noted in the companion case Tire
Eng'g & Distribution LLC v Bank of China (740 F3d 108, 115 [2d

---

services industry are subject to appropriate requirements to
report potential money laundering transactions to proper
authorities, and that jurisdictional disputes do not hinder
examination of compliance by financial institutions with relevant
reporting requirements"]; 31 C.F.R. § 1020.220 [requiring risk-
based customer verification procedures]).

Cir 2014]), the separate entity rule "is not the product of a textual analysis of the CPLR" but is instead a "judicially created doctrine" that is "not tethered to the CPLR's text."

This Court has consistently clung to the principle of plain statutory construction (see e.g. Matter of Di Brizzi (Proskauer), 303 NY 206, 214 [1951] [although the statute was enacted due to a war emergency, because the Legislature utilized general terms, and did not either expressly or by implication, limit its operation to a time of war, we may not do so]; Tucker v Bd. of Educ., Cmty. Sch. Dist. No. 10, 82 NY2d 274, 278 [1993] ["where . . . the statute unequivocally describes in general terms the particular situation in which it is to apply and nothing indicates a contrary legislative intent, the courts should not impose limitations on the clear statutory language."]).

We have also resisted the temptation to legislate, mindful that "[c]ourts are not supposed to legislate under the guise of interpretation, and in the long run it is better to adhere closely to this principle and leave it to the Legislature to correct evils if any exist" (Bright Homes v Wright, 8 NY2d 157, 162 [1960]; see also In re Amorosi, 9 NY3d 367, 372 [2007] ["[t]he courts are not free to legislate and if any unsought consequences result, the Legislature is best suited to evaluate and resolve them."]). The majority avoids any analysis of the statute, reasoning that the separate entity rule is a creation of

common law, which predates the CPLR by several decades.  But the point about the rule predating the CPLR is, to my mind, good reason for us to conclude that the separate entity rule should be rejected, not embraced.  The fact remains that the rule finds no support in the statutory framework of CPLR article 52, and imports an exception to the statutory enforcement scheme.  Such an exception is solely the prerogative of the Legislature, not this Court.

II.

The Separate Entity Rule is Obsolete and Runs Counter to Public Policy

Lower courts in the early part of the last century began to apply a separate entity rule on the theory that one bank branch had no way to ascertain the status of a debtor's account at another branch.  Some subsequent courts followed suit.  The majority believes that this Court should adopt the rule today in the name of stare decisis (majority op at 11) for the benefit of the banks who prefer this extensive limitation on their obligations.  Initially, I note that the adoption of the rule by some lower New York courts and some federal courts does not mean that the rule is entitled to stare decisis effect.  More fundamentally, I cannot agree that the majority's stare decisis rationale is a good reason to place our imprimatur on an anachronistic rule that greatly diminishes the scope and reach of post-judgment enforcement proceedings.

Notably, some of the first cases enunciating a separate entity rule[2] relied upon Chrzanowska v Corn Exch. Bank (173 AD 285 [1916], affd without opinion, 225 NY 728 [1919]). That 1916 First Department decision held that different branches of a bank are "separate and distinct from one another as from any other bank" because "[t]he Legislature did not intend, we think, either to authorize or require a bank having branches to cash checks and make loans to a depositor at any branch at which he may see fit to call, for to do so would produce endless confusion. . ." (173 AD at 291). This observation is an indication of just how much, with the advent of modern technology, the world in general, and the banking industry in particular, has changed since 1916. It also tells us that the underpinnings of the rationale for the separate entity rule have long since decayed.

In 1950, a trial court in New York County applied the reasoning of Chrzanowska when it held:

> "Unless each branch of a bank is treated as a separate entity for attachment purposes, no branch could safely pay a check drawn by its depositor without checking with all other branches and the main office to make sure that no warrant of attachment had been served upon any of them. Each time a warrant of attachment is served upon one branch, every other branch and the main office would have to be notified. This would place an intolerable burden upon banking and commerce, particularly where the branches are numerous, as is often the case."

---

[2]These cases include Clinton Trust Co. v Compania Azucarera Cent. Ramona, S.A. (14 NYS2d 743 [Sup Ct NY Co 1939], affd without opinion 15 NYS2d 721 [1st Dept 1939]) and Bluebird Undergarment Corp. v Gomez (249 NYS 319 [City Ct NY CO 1931]).

(Cronan v Schilling, 100 NYS2d 474, 476 [Sup Ct NY Co 1950]).

In this day of centralized banking and advanced technology, bank

branches can communicate with each other in a matter of seconds.

Banks are no longer faced with this "intolerable burden" when

served with a restraining notice.  That the separate entity rule

no longer made practical sense was recognized over 30 years ago

by the United States District Court for the Southern District of

New York, when it noted in Digitrex, Inv. v Johnson (491 F Supp

66, 68 [SD NY 1980]) that "operations at most if not all New York

City commercial banks . . . have become largely computerized" and

concluded that "it is clear that the argument in favor of the

rule set forth in 1950 in Cronan [ ] is no longer persuasive."

The First Department agreed in S&S Mach. Corp v Manufacturer's

Hanover Trust Co. (219 AD2d 249 [1st Dept 1996]), when it applied

the Digitrex rule to a post-judgment restraining notice and

information subpoena:

> "The Digitrex court argued persuasively that
> the old New York rule, requiring that the
> judgment creditor serve his postjudgment
> process on the particular branch of the bank
> where the judgment debtor's assets were
> located, was obsolete in an era when large
> commercial banks use centralized computer
> databases to handle their accounts."

(219 AD2d at 252).  And as the Second Circuit aptly noted in this

case, "the original basis for the separate entity rule may have

weakened or even disappeared over time" (740 F3d at 117).

While the longstanding nature of certain common law

rules is important, that should not prevent this Court from being

flexible enough to acknowledge that the world has changed and
that the law must change with it.  As Judge Cardozo once
observed:

> "I think that when a rule, after it has been
> duly tested by experience, has been found to
> be inconsistent with the sense of justice or
> with the social welfare, there should be less
> hesitation in frank avowal and full
> abandonment. We have had to do this sometimes
> in the field of constitutional law. Perhaps
> we should do so oftener in fields of private
> law where considerations of social utility
> are not so aggressive and insistent. There
> should be greater readiness to abandon an
> untenable position when the rule to be
> discarded may not reasonably be supposed to
> have determined the conduct of the litigants,
> *and particularly when in its origin it was
> the product of institutions or conditions
> which have gained a new significance or
> development with the progress of the years*"

(Cardozo, The Nature of the Judicial Process [1921 ed.], pp 150-
151, emphasis added).

Our society has most certainly evolved since the
separate entity rule was first formulated, and the initial
reasons for the rule no longer exist.  The majority notes that
banks have been relying on the separate entity doctrine for years
and posits that any change might negatively impact the banking
industry in New York.  But while banks may place some technical
reliance on the separate entity rule, they cannot rely on blind
and unwavering adherence to legal norms birthed in the bygone era
which that rule represents, for the government, banks and bank
customers have shifted their practices and expectations to
conform to a very different modern reality.  Banks in the United
States are now subject to complex and far-reaching government

regulations regarding their relationships with their customers. Yet banks continue to do business in this country.

Both the New York and federal government have brought enforcement actions against banks under the Bank Secrecy Act. Standard Chartered Bank in particular agreed to a settlement in 2012 with the New York State Department of Financial Services (DFS) which included a civil penalty of $340 million and the installation of a monitor to report directly to the DFS and to evaluate the bank's money-laundering risk controls (See Press Release, N.Y. Department of Financial Services, *Statement of Benjamin M. Lawsky, Superintendent of Financial Services, Regarding Standard Chartered Bank,* Aug. 14, 2012).

Additionally, "[i]n 2012, HSBC Holdings PLC paid $1.9 billion after admitting violations of the Bank Secrecy Act and other laws. Regulators also reached a smaller settlement with Standard Chartered PLC and cited Citigroup Inc. and J.P. Morgan Chase & Co. for deficient money-laundering controls" (Andrew Grossman, *Banks Face New U.S. Moves Against Laundering,* WALL ST. J. [Jan. 9, 2014]). Recently, in September 2014, a jury in the United States District Court for the Eastern District found Arab Bank civilly liable for the material support of 24 Hamas terror attacks, in violation of the civil provisions of the Anti-Terrorism Act (Linde v Arab Bank, 04-CV-2799, NYLJ 9/23/14) and the United States Court of Appeals for the Second Circuit reinstated claims by victims of terrorist attacks against the National Westminster Bank for supporting Hamas by handling money

for the Palestine Relief & Development Fund (<u>Weiss v National Westminster Bank</u>,__F3d __, 2014 WL 4667348 [2d Cir 2014]).

Banks have apparently adjusted to the societal expectation that they will be responsible corporate citizens, presumably by using modern technology and a reasonable share of their resources to shoulder the burden of compliance with a regulatory regime of global reach.  In this environment, surely every bank knows that it no longer exists in a world where it can shrug off a duly entered judgment for assets in its collective coffers on the theory that it would have to resort to a long game of international telephone tag, as opposed to a brief search of its computer database, to restrain funds subject to collection. The difficulties that banks will face should we require foreign branches to comply with post-judgment proceedings to enforce the rights of judgment creditors will likely pale in comparison to banks' efforts to comply with the US Patriot Act and the Bank Secrecy Act.

In my view, any burden imposed on the banks is far outweighed by the rights of judgment creditors to enforce their judgments.  While this case involves a judgment entered in favor of a big corporation, our holding will affect all sorts of judgment creditors.  Take for example, employees who wend their way through the court system and eventually obtain a substantial judgment against their employer for labor law and human rights violations, only to find that the employer has removed all assets from bank accounts located in New York, and placed them in a

foreign branch.  By the majority's reckoning, these employees can find no relief in post-judgment enforcement proceedings, because it is too burdensome or problematic for the banks to enforce a restraining order in a foreign bank branch.

III.

A Blanket and All-Encompassing Separate Entity Rule is Not
Necessary to Promote Comity

The majority reasons that the separate entity rule promotes comity.  But while the majority would apply the separate entity rule in *all* instances where a judgment creditor seeks to reach assets held in a foreign branch, there are many countries where banks would not face conflicting laws, and where complying with a restraining notice would be consistent with the law where the foreign branch is located.  Thus, there is no need for the broad sweep employed by the majority to promote comity. "International comity comes into play only when there is a true conflict between American law and that of a foreign jurisdiction" (In re Maxwell Commc'n Corp., plc, 93 F3d 1036, 1049 [2d Cir 1996]).  That CPLR article 52 might conflict with some other country's laws does not require that the separate entity rule be imposed to protect accounts of judgment debtors deposited anywhere outside of the United States.  The majority's use of the separate entity rule to address potential comity issues is akin to using a cannon to kill a fly.  Less extreme measures are more appropriate and just as effective.

As for jurisdictions where a bank is faced with

potential liabilities for complying with a restraining notice,
CPLR 5240 gives a court discretion to deny, limit, condition or
modify the use of any enforcement procedure.  Thus, we need not
adopt a categorical separate entity rule in the name of comity.
A bank's concerns about double liability and other exposure may
be addressed by a court.[3] Banks do not need to be protected
through application of this wide-ranging separate entity rule.

IV.

The Majority's Reasoning Cannot be Reconciled with Koehler

Putting aside the obvious obsolescence and lack of
necessity for the separate entity rule, our decision in Koehler
makes it clear that we believe "that the Legislature intended
CPLR article 52 to have extraterritorial reach" (12 NY3d at 539).
Answering a question certified to us by the Second Circuit
involving a garnishee bank and a turnover proceeding pursuant to
CPLR 5225, we held that "the principle that a New York court may
issue a judgment ordering the turnover of out-of-state assets is
not limited to judgment debtors, but applies equally to
garnishees"(id. at 541).  Our reasoning was based on the words of

---

[3]In this case, the District Court was unpersuaded by
Standard Chartered Bank's "dire predictions" that it would be
subject to double liability, and further noted that even assuming
this would occur, banks assume that risk in New York as an
ordinary cost of doing business in multiple jurisdictions (978 F
Supp2d at 210). Furthermore, as plaintiff argues, Standard
Chartered Bank has not demonstrated that it is actually subject
to any liability in light of the indemnification agreement that
it has with the Jordan Dubai Islamic Bank, an Uzan proxy subject
to the District Court's Freeze Order.

the statute.

> "CPLR article 52 contains no express
> territorial limitation barring the entry of a
> turnover order that requires a garnishee to
> transfer money or property into New York from
> another state or country. It would have been
> an easy matter for the Legislature to have
> added such a restriction to the reach of
> article 52 and there is no basis for us to
> infer it from the broad language presently in
> the statute" (id. at 539).

The majority, focused on the common law, is unconcerned with the wording of the statute.  But Koehler's reasoning that the statutory language answered the certified question with respect to CPLR 5225 should apply with equal force in our examination of CPLR 5222.  Although the Koehler court did not address the separate entity rule, Koehler's interpretation of CPLR article 52 and its holding that article 52 has extraterritorial reach cannot be reconciled with today's decision adopting the separate entity rule.  The scope of the Koehler majority's decision was understood by the Koehler dissent:

> "If the bank has a New York branch—either one
> that is not separately incorporated, or a
> subsidiary with which the parent's
> relationship is close enough to subject the
> parent to New York jurisdiction—the judgment
> creditor, having registered the judgment in
> New York, can obtain an order requiring the
> asset to be delivered here"
> (12 NY3d at 542 [Smith, J., dissenting]).

This is precisely the point that the majority here has overlooked.

That recognition of the separate entity rule is inconsistent with Koehler is reflected not only in the Koehler

dissent's observation, but in legislation proposed by The Clearing House Association and the Institute of International Bankers (both appear as amici curiae in support of Standard Chartered Bank in this action) to "correct" our decision in Koehler by adding language to CPLR 5222 (b) providing that a restraining notice served on a bank shall have no effect with respect to property or accounts held at a branch or office of the bank outside the state (see Jan. 19, 2010 Letter from the Clearing House Association LLC and the Institute of International Bankers addressed to Gov. David Paterson).  Additionally, legislation proposed by Senator Farley in June 2013 (s. 5734), sought to amend CPLR 5222 to provide that a restraining notice that seeks to restrain property or money outside the United States shall have no effect except to the extent that it is served on the judgment debtor.  This underscores that the majority's adoption of the separate entity rule is inconsistent with Koehler, and that any implementation of the rule must be done through amendment to CPLR article 52 by the Legislature, not this Court.

V.

Conclusion

Enforcement of money judgments is an integral and vital part of our legal system, as evidenced by the extensive post-judgment enforcement scheme of CPLR article 52.  A separate entity rule that shields assets in foreign banks will serve primarily to protect defiant judgment debtors, such as the Uzans,

who have the means to maintain considerable amounts of money in foreign accounts, to frustrate collection of large judgments, and to immunize banks who benefit from doing business in New York from their responsibilities under the statutory enforcement provisions.

Therefore, I would answer the certified question "No."

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.27 of this Court's Rules of Practice, and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified question answered in the affirmative.  Opinion by Judge Graffeo.  Chief Judge Lippman and Judges Read, Smith and Rivera concur.  Judge Abdus-Salaam dissents in an opinion in which Judge Pigott concurs.

Decided October 23, 2014