Abdus-Salaam, J.
(dissenting). Today, in the year 2014, the majority for the first time expressly adopts the separate entity rule for postjudgment enforcement proceedings under CPLR article 52. The rule has no statutory basis and was initially formulated by the lower courts nearly a century ago based on a rationale that has no application to these modern times. In choosing this outmoded rule, the majority has engaged in improper judicial legislation, avoided the clear import of our recent decision in Koehler v Bank of Bermuda Ltd. (12 NY3d *164 533 [2009]) and given short shrift to the compelling public policy reasons to reject such a rule.
The majority has, in this particular case, permitted the judgment debtors, individuals who owe plaintiff over $2 billion in consequential damages and $1 billion in punitive damages, who are subject to arrest orders from the United States District Court for the Southern District of New York and The English High Court of Justice, and who have been convicted of multibillion dollar bank frauds in Turkey, to evade enforcement proceedings in New York. As was described by the Second Circuit, “[r]elying on their vast personal wealth, the Uzans have time and again deployed their lawyers to raise legal roadblocks to the enforcement of the judgment against them. They have persistently endeavored to evade the lawful jurisdiction of the District Court and undermine its careful and determined work” (Motorola Credit Corp. v Uzan, 561 F3d 123, 127 [2d Cir 2009]). Standard Chartered Bank, by persuading the majority of this Court to adopt the obsolete separate entity rule, has aided its fugitive customers by erecting a monumental roadblock to plaintiffs enforcement of the staggering judgment.
In broader terms, today’s holding permits banks doing business in New York to shield customer accounts held in branches outside of this country, thwarts efforts by judgment creditors to collect judgments, and allows even the most egregious and flagrant judgment debtors to make a mockery of our courts’ duly entered judgments. In an age where banks are being held more accountable than ever for their actions vis-a-vis their customers,[1] today’s holding is a deviation from current public policy regarding the responsibilities of banks and a step in the wrong direction.
*165 I
CPLR Article 52 Neither Expressly Nor Impliedly Incorporates a Separate Entity Rule
I begin my analysis of CPLR 5222 (b) with the generally accepted premise that the “starting point” is “the language itself, giving effect to the plain meaning thereof’ (Commonwealth of the N. Mariana Is. v Canadian Imperial Bank of Commerce, 21 NY3d 55, 60 [2013] [internal quotation marks and citation omitted]). The statute provides, in pertinent part, with respect to third parties served with a postjudgment restraining notice:
“All property in which the judgment debtor or obligor is known or believed to have an interest then in and thereafter coming into the possession or custody of such a person, including any specified in the notice, and all debts of such a person, including any specified in the notice, then due and thereafter coming due to the judgment debtor or obligor, shall be subject to the notice.”
Nothing in the statute exempts third parties that are banks, or branches of banks, from complying with the restraining notice. As the Second Circuit noted in the companion case Tire Eng’g & Distrib. L.L.C. v Bank of China Ltd. (740 F3d 108, 115 [2d Cir 2014]), the separate entity rule “is not the product of a textual analysis of the CPLR” but is instead a “judicially created doctrine” that is “not tethered to the CPLR’s text.”
This Court has consistently clung to the principle of plain statutory construction (see e.g. Matter of Di Brizzi [Proskauer], 303 NY 206, 214 [1951] [although the statute was enacted due to a war emergency, because the legislature utilized general terms, and did not, either expressly or by implication, limit its operation to a time of war, we may not do so]; Matter of Tucker v Board of Educ., Community School Dist. No. 10, 82 NY2d 274, 278 [1993] [“where . . . the statute unequivocally describes in general terms the particular situation in which it is to apply and nothing indicates a contrary legislative intent, the courts should not impose limitations on the clear statutory language”]).
We have also resisted the temptation to legislate, mindful that “[c]ourts are not supposed to legislate under the guise of interpretation, and in the long run it is better to adhere closely to this principle and leave it to the Legislature to correct evils if any exist” (Bright Homes v Wright, 8 NY2d 157, 162 [1960]; see *166 also Matter of Amorosi v South Colonie Ind. Cent. School Dist., 9 NY3d 367, 372 [2007] [“the courts are not free to legislate and if any unsought consequences result, the Legislature is best suited to evaluate and resolve them”]). The majority avoids any analysis of the statute, reasoning that the separate entity rule is a creation of common law, which predates the CPLR by several decades. But the point about the rule predating the CPLR is, to my mind, good reason for us to conclude that the separate entity rule should be rejected, not embraced. The fact remains that the rule finds no support in the statutory framework of CPLR article 52, and imports an exception to the statutory enforcement scheme. Such an exception is solely the prerogative of the legislature, not this Court.
II
The Separate Entity Rule is Obsolete and Runs Counter to Public Policy
Lower courts in the early part of the last century began to apply a separate entity rule on the theory that one bank branch had no way to ascertain the status of a debtor’s account at another branch. Some subsequent courts followed suit. The majority believes that this Court should adopt the rule today in the name of stare decisis (majority op at 162) for the benefit of the banks who prefer this extensive limitation on their obligations. Initially, I note that the adoption of the rule by some lower New York courts and some federal courts does not mean that the rule is entitled to stare decisis effect. More fundamentally, I cannot agree that the majority’s stare decisis rationale is a good reason to place our imprimatur on an anachronistic rule that greatly diminishes the scope and reach of postjudgment enforcement proceedings.
Notably, some of the first cases enunciating a separate entity rule[2] relied upon Chrzanowska v Corn Exch. Bank (173 App Div 285 [1916], affd without op 225 NY 728 [1919]). That 1916 First Department decision held that different branches of a bank are “separate and distinct from one another as from any other bank” because “[t]he Legislature did not intend, we think, either to authorize or require a bank having branches to cash *167 checks and make loans to a depositor at any branch at which he may see fit to call, for to do so would produce endless confusion” (173 App Div at 291). This observation is an indication of just how much, with the advent of modern technology, the world in general, and the banking industry in particular, has changed since 1916. It also tells us that the underpinnings of the rationale for the separate entity rule have long since decayed.
In 1950, a trial court in New York County applied the reasoning of Chrzanowska when it held:
“Unless each branch of a bank is treated as a separate entity for attachment purposes, no branch could safely pay a check drawn by its depositor without checking with all other branches and the main office to make sure that no warrant of attachment had been served upon any of them. Each time a warrant of attachment is served upon one branch, every other branch and the main office would have to be notified. This would place an intolerable burden upon banking and commerce, particularly where the branches are numerous, as is often the case” (Cronan v Schilling, 100 NYS2d 474, 476 [Sup Ct, NY County 1950]).
In this day of centralized banking and advanced technology, bank branches can communicate with each other in a matter of seconds. Banks are no longer faced with this “intolerable burden” when served with a restraining notice. That the separate entity rule no longer made practical sense was recognized over 30 years ago by the United States District Court for the Southern District of New York, when it noted in Digitrex, Inc. v Johnson (491 F Supp 66, 68 [SD NY 1980]) that “operations at most if not all New York City commercial banks . . . have become largely computerized” and concluded that “it is clear that the argument in favor of the rule set forth in 1950 in Cronan . . . is no longer persuasive.” The First Department agreed in S & S Mach. Corp. v Manufacturers Hanover Trust Co. (219 AD2d 249 [1st Dept 1996]), when it applied the Digitrex rule to a postjudgment restraining notice and information subpoena:
“The Digitrex court argued persuasively that the old New York rule, requiring that the judgment creditor serve his postjudgment process on the particular branch of the bank where the judgment debtor’s assets were located, was obsolete in an era when large commercial banks use centralized com *168 puter databases to handle their accounts” (219 AD2d at 252).
And as the Second Circuit aptly noted in this case, “the original basis for the separate entity rule may have weakened or even disappeared over time” (740 F3d at 117).
While the long-standing nature of certain common-law rules is important, that should not prevent this Court from being flexible enough to acknowledge that the world has changed and that the law must change with it. As Judge Cardozo once observed:
“I think that when a rule, after it has been duly tested by experience, has been found to be inconsistent with the sense of justice or with the social welfare, there should be less hesitation in frank avowal and full abandonment. We have had to do this sometimes in the field of constitutional law. Perhaps we should do so oftener in fields of private law where considerations of social utility are not so aggressive and insistent. There should be greater readiness to abandon an untenable position when the rule to be discarded may not reasonably be supposed to have determined the conduct of the litigants, and particularly when in its origin it was the product of institutions or conditions which have gained a new significance or development with the progress of the years” (Cardozo, The Nature of the Judicial Process at 150-151 [1921 ed] [emphasis added]).
Our society has most certainly evolved since the separate entity rule was first formulated, and the initial reasons for the rule no longer exist. The majority notes that banks have been relying on the separate entity doctrine for years and posits that any change might negatively impact the banking industry in New York. But while banks may place some technical reliance on the separate entity rule, they cannot rely on blind and unwavering adherence to legal norms birthed in the bygone era which that rule represents, for the government, banks and bank customers have shifted their practices and expectations to conform to a very different modern reality. Banks in the United States are now subject to complex and far-reaching government regulations regarding their relationships with their customers. Yet banks continue to do business in this country.
Both the New York and federal government have brought enforcement actions against banks under the Bank Secrecy Act. *169 Standard Chartered Bank in particular agreed to a settlement in 2012 with the New York State Department of Financial Services (DFS) which included a civil penalty of $340 million and the installation of a monitor to report directly to the DFS and to evaluate the bank’s money-laundering risk controls (see Press Release, NY Department of Financial Services, Statement from Benjamin M. Lawsky, Superintendent of Financial Services, Regarding Standard Chartered Bank, Aug. 14, 2012, available at http://www.dfs.ny.gov/about/press/prl208141.htm).
Additionally, “[i]n 2012, HSBC Holdings PLC paid $1.9 billion after admitting violations of the Bank Secrecy Act and other laws. Regulators also reached a smaller settlement with Standard Chartered PLC and cited Citigroup Inc. and J.P. Morgan Chase & Co. for deficient money-laundering controls” (Andrew Grossman, Banks Face New U.S. Moves Against Laundering, Wall St J, Jan. 9, 2014). Recently, in September 2014, a jury in the United States District Court for the Eastern District of New York found Arab Bank civilly liable for the material support of 24 Hamas terror attacks, in violation of the civil provisions of the Anti-Terrorism Act (Andrew Keshner, Arab Bank Found Liable for Terror Support, NYLJ, Sept. 23, 2014 [discussing verdict in Linde v Arab Bank, 04-CV-2799]) and the United States Court of Appeals for the Second Circuit reinstated claims by victims of terrorist attacks against the National Westminster Bank for supporting Hamas by handling money for the Palestine Relief & Development Fund (Weiss v National Westminster Bank PLC, 768 F3d 202 [2d Cir 2014]).
Banks have apparently adjusted to the societal expectation that they will be responsible corporate citizens, presumably by using modern technology and a reasonable share of their resources to shoulder the burden of compliance with a regulatory regime of global reach. In this environment, surely every bank knows that it no longer exists in a world where it can shrug off a duly entered judgment for assets in its collective coffers on the theory that it would have to resort to a long game of international telephone tag, as opposed to a brief search of its computer database, to restrain funds subject to collection. The difficulties that banks will face should we require foreign branches to comply with postjudgment proceedings to enforce the rights of judgment creditors will likely pale in comparison to banks’ efforts to comply with the USA PATRIOT Act and the Bank Secrecy Act.
*170 In my view, any burden imposed on the banks is far outweighed by the rights of judgment creditors to enforce their judgments. While this case involves a judgment entered in favor of a big corporation, our holding will affect all sorts of judgment creditors. Take, for example, employees who wend their way through the court system and eventually obtain a substantial judgment against their employer for labor law and human rights violations, only to find that the employer has removed all assets from bank accounts located in New York, and placed them in a foreign branch. By the majority’s reckoning, these employees can find no relief in postjudgment enforcement proceedings, because it is too burdensome or problematic for the banks to enforce a restraining order in a foreign bank branch.
Ill
A Blanket and All-Encompassing Separate Entity Rule is Not Necessary to Promote Comity
The majority reasons that the separate entity rule promotes comity. But while the majority would apply the separate entity rule in all instances where a judgment creditor seeks to reach assets held in a foreign branch, there are many countries where banks would not face conflicting laws, and where complying with a restraining notice would be consistent with the law where the foreign branch is located. Thus, there is no need for the broad sweep employed by the majority to promote comity. “International comity comes into play only when there is a true conflict between American law and that of a foreign jurisdiction” (In re Maxwell Communication Corp. plc by Homan, 93 F3d 1036, 1049 [2d Cir 1996]). That CPLR article 52 might conflict with some other country’s laws does not require that the separate entity rule be imposed to protect accounts of judgment debtors deposited anywhere outside of the United States. The majority’s use of the separate entity rule to address potential comity issues is akin to using a cannon to kill a fly. Less extreme measures are more appropriate and just as effective.
As for jurisdictions where a bank is faced with potential liabilities for complying with a restraining notice, CPLR 5240 gives a court discretion to deny, limit, condition or modify the use of any enforcement procedure. Thus, we need not adopt a categorical separate entity rule in the name of comity. A bank’s concerns about double liability and other exposure may be ad *171 dressed by a court.[3] Banks do not need to be protected through application of this wide-ranging separate entity rule.
IV
The Majority’s Reasoning Cannot be Reconciled with Koehler
Putting aside the obvious obsolescence and lack of necessity for the separate entity rule, our decision in Koehler makes it clear that we believe “that the Legislature intended CPLR article 52 to have extraterritorial reach” (12 NY3d at 539). Answering a question certified to us by the Second Circuit involving a garnishee bank and a turnover proceeding pursuant to CPLR 5225, we held that “the principle that a New York court may issue a judgment ordering the turnover of out-of-state assets is not limited to judgment debtors, but applies equally to garnishees” (id. at 541). Our reasoning was based on the words of the statute.
“CPLR article 52 contains no express territorial limitation barring the entry of a turnover order that requires a garnishee to transfer money or property into New York from another state or country. It would have been an easy matter for the Legislature to have added such a restriction to the reach of article 52 and there is no basis for us to infer it from the broad language presently in the statute” (id. at 539).
The majority, focused on the common law, is unconcerned with the wording of the statute. But Koehler’s reasoning that the statutory language answered the certified question with respect to CPLR 5225 should apply with equal force in our examination of CPLR 5222. Although the Koehler court did not address the separate entity rule, Koehler’s interpretation of CPLR article 52 and its holding that article 52 has extraterritorial reach cannot be reconciled with today’s decision adopting the separate entity rule. The scope of the Koehler majority’s decision was understood by the Koehler dissent:
*172 “If the bank has a New York branch — either one that is not separately incorporated, or a subsidiary with which the parent’s relationship is close enough to subject the parent to New York jurisdiction — the judgment creditor, having registered the judgment in New York, can obtain an order requiring the asset to be delivered here” (12 NY3d at 542 [Smith, J., dissenting]).
This is precisely the point that the majority here has overlooked.
That recognition of the separate entity rule is inconsistent with Koehler is reflected not only in the Koehler dissent’s observation, but in legislation proposed by The Clearing House Association and the Institute of International Bankers (both appear as amici curiae in support of Standard Chartered Bank in this action) to “correct” our decision in Koehler by adding language to CPLR 5222 (b) providing that a restraining notice served on a bank shall have no effect with respect to property or accounts held at a branch or office of the bank outside the state (see Letter from The Clearing House Association LLC and Institute of International Bankers addressed to Governor David Paterson, Jan. 19, 2010, available at http://c.ymcdn.com/sites/ iib.site-ym.com/resource/resmgr/imported/20100119Letter _Paterson.pdf). Additionally, legislation proposed by Senator Farley in June 2013 (2013 NY Senate Bill S5734) sought to amend CPLR 5222 to provide that a restraining notice that seeks to restrain property or money outside the United States shall have no effect except to the extent that it is served on the judgment debtor. This underscores that the majority’s adoption of the separate entity rule is inconsistent with Koehler, and that any implementation of the rule must be done through amendment to CPLR article 52 by the legislature, not this Court.
V
Conclusion
Enforcement of money judgments is an integral and vital part of our legal system, as evidenced by the extensive postjudgment enforcement scheme of CPLR article 52. A separate entity rule that shields assets in foreign banks will serve primarily to protect defiant judgment debtors, such as the Uzans, who have the means to maintain considerable amounts of money in *173 foreign accounts, to frustrate collection of large judgments, and to immunize banks who benefit from doing business in New York from their responsibilities under the statutory enforcement provisions.
Therefore, I would answer the certified question “No.”
Chief Judge Lippman and Judges Read, Smith and Rivera concur with Judge Graffeo; Judge Abdus-Salaam dissents in an opinion in which Judge Pigott concurs.
Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.27 of this Court’s Rules of Practice, and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified question answered in the affirmative.

. See e.g. USA PATRIOT Act of 2001, Pub L 107-56, tit III, § 302 (b) (1), (4), (11), 115 US Stat 272 (amending Bank Secrecy Act to, among other things, “increase the strength of United States measures to prevent, detect, and prosecute international money laundering and the financing of terrorism,” “provide a clear national mandate for subjecting to special scrutiny those foreign jurisdictions, financial institutions operating outside of the United States, and classes of international transactions or types of accounts that pose particular, identifiable opportunities for criminal abuse,” and “to ensure that all appropriate elements of the financial services industry are subject to appropriate requirements to report potential money laundering transactions to proper authorities, and that jurisdictional disputes do not hinder examination of compliance by financial institutions with relevant reporting requirements”); 31 CFR 1020.220 (requiring risk-based customer verification procedures).

. These cases include Clinton Trust Co. v Compania Azucarera Cent. Ramona S.A. (172 Misc 148 [Sup Ct, NY County 1939], aff'd without op 258 App Div 780 [1st Dept 1939]) and Bluebird Undergarment Corp. v Gomez (139 Misc 742 [NY City Ct 1931]).

. In this case, the District Court was unpersuaded by Standard Chartered Bank’s “dire predictions” that it would be subject to double liability, and further noted that even assuming this would occur, banks assume that risk in New York as an ordinary cost of doing business in multiple jurisdictions (978 F Supp 2d 205, 210 [SD NY 2013]). Furthermore, as plaintiff argues, Standard Chartered Bank has not demonstrated that it is actually subject to any liability in light of the indemnification agreement that it has with the Jordan Dubai Islamic Bank, an Uzan proxy subject to the District Court’s freeze order.